STATE of Missouri, Respondent,

v.

**Tomas G. ERVIN, Appellant.**

No. 72593.

Supreme Court of Missouri,
En Banc.

July 21, 1992.

As Modified on Denial of Rehearing
Sept. 22, 1992.

Janet Thompson, Columbia, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Chief Justice.

Following a change of venue from Cole County, a Callaway County jury convicted appellant, Tomas G. Ervin, of two counts of first-degree murder, Section 565.-020, RSMo 1986,[1] and one count of first-degree robbery, Section 569.020. The jury recommended and the trial court imposed the death sentence. This Court has exclusive appellate jurisdiction over cases in which the death penalty is imposed. Mo. Const. art. V, § 3. Under Rule 29.15, Er-

---

1. All statutory references are to Missouri Revised Statutes 1986 unless otherwise indicated.

vin also seeks appellate review of the overruling of his post-conviction motions. Ervin advances 26 points and 40 specifically enumerated subpoints of alleged error. Appellant's allegations of error attack every phase of the proceedings in the trial court, more often than not seeking plain error review where the charge of error was not preserved for appellate review. Finding no reversible error, the judgment of the trial court is affirmed as to Ervin's guilt, the sentence of death imposed, and the trial court's overruling of appellant's Rule 29.15 motion.

## I. THE CASE

This Court takes the facts in a light most favorable to the verdict. Bert L. Hunter and Tommy Ervin were friends. Hunter resided in Largo, Florida. Ervin lived in Jefferson City, Missouri. In late November, 1988, Hunter visited Ervin in Missouri. Both men were desperately short of pecuniary resources. They discussed possible criminal schemes for remedying that condition. Hunter suggested robbing a bank. Ervin had a much more complicated scheme; he wanted to kidnap a person of means and force that person to withdraw money from an account at his/her bank. After discussing the two options, Hunter and Ervin chose to begin with Ervin's plan. To that end, they began looking at several homes in Jefferson City as possible targets but did not select one. Hunter returned to Florida.

In early December, 1988, Ervin visited Hunter in Florida. There, Ervin purchased rubber gloves for use in the planned crime(s) still under discussion between the two. By December 12, 1988, Hunter and Ervin had returned to Jefferson City. Ervin purchased plastic trash bags from the local Wal–Mart Store, again for use in the contemplated crime.

Mildred Hodges, 75, and her son, Richard, 49, lived on Boonville Road in Jefferson City. As he continued to search for targets for the kidnapping and murder crime, Ervin noticed the Hodgeses' Lincoln Continental parked in front of their home. Reasoning that a Lincoln Continental was a sure sign of wealth, Ervin and Hunter settled on the Hodgeses as their intended victims.

Hunter and Ervin planned for Hunter to gain entry to the Hodgeses' house by posing as a delivery person; Ervin would follow Hunter into the house. Once in the house, the plan called for Ervin to select one of the occupants to go to the bank to extract money. Hunter intended to remain in the house with any other occupants and await Ervin's return. Ervin and Hunter had agreed in advance that there would be no witnesses to the crime; the plastic bags purchased from Wal–Mart would serve the purpose of suffocating the occupants of the house. They would dispose of the bodies in a trash incinerator.

Around noon on December 15, 1988, Ervin and Hunter put their plan into action. They drove Ervin's 1981 Mazda to the Hodgeses' home. Posing as a delivery person, Hunter knocked on the front door. Mildred Hodges answered. Hunter pushed his way through the door, grabbed her arm, and dragged her into the house. Ervin followed, shutting the door. Hunter produced a pistol. Mildred panicked. In her struggle, she called out to her son, Richard, for help. Unknown to Hunter and Ervin, the Hodgeses operated a realty company from their home. Apparently conducting company business, Richard was in the office facing the front of the house when the struggle began. Richard came out of the office and told Hunter to let his mother go. Hunter released Mildred, who fell against the wall and bloodied her nose.

Richard told Ervin and Hunter of his mother's heart problem. Hunter requested that Richard calm his mother. Richard escorted Mildred to a bedroom across the hall from the office. Mildred sat on the bed. At Hunter's direction, Richard bound her hands and feet with duct tape.

Mildred and Richard pled with Ervin and Hunter to let them go. They said that they had no cash, that all their money was in a trust fund and unavailable to them. They promised that if Hunter and Ervin would simply leave the house, they would not call the police. Richard also told Ervin and

Hunter that a person from the newspaper had arranged to come to the house at 1:00 p.m. to pick up an advertisement for the realty company.

This prospect alarmed Ervin and Hunter. They left Mildred on the bed and took Richard to the living room. There they began to bind his hands and feet with duct tape. Hunter heard a noise from the bedroom. On investigation, he found Mildred standing in front of a dresser. Hunter immediately bound Mildred with duct tape again and left her on the hallway floor near the bedroom. Hunter returned to the living room.

When Ervin saw that Hunter had returned, he nodded and proceeded to put duct tape over Richard's mouth and nose. When Richard complained that he could not breathe, Ervin told him, "That's the general idea." In a frenzy, Richard broke free. Ervin and Hunter subdued him, placed him on his stomach, and taped his hands behind his back. Hunter told Ervin, "Well, you know, go take care of [Mildred]." Hunter placed tape over Richard's nose and mouth and put a plastic bag over his head. Hunter held Richard's nose and throat for two or three minutes until he lost consciousness. As Hunter smothered Richard in the living room, Ervin placed a trash bag over Mildred's head in the hallway and held it there until she, too, lost consciousness.

Ervin and Hunter took Richard's wallet and Mildred's purse and then left in Ervin's car. They returned to the Hodgeses' residence that evening, shortly after midnight. Wearing the rubber gloves Ervin had purchased in Florida, the two wrapped the victims' bodies in trash bags and sealed the bags with duct tape. When parts of the rubber gloves adhered to the duct tape and tore off, they switched to leather gloves. That task completed, they ransacked the house for valuables, finding some jewelry, furs, Scotch whiskey, and $16.00 in cash. Next, they dragged Richard Hodges' body into the garage and put it into the back seat of the Lincoln Continental. Deviating from their plan, they decided to dump Richard's body in a ditch alongside the railroad tracks near Marion, Missouri. Ervin drove the Lincoln; Hunter followed in Ervin's Mazda.

Having disposed of Richard's body, they drove back to get Mildred's body. When Ervin and Hunter tried to move it, Mildred's body emitted fluids and a bad odor; they decided to leave her body there. They left the residence, taking the Lincoln Continental, which they left in another area of Jefferson City with the keys in it.

Ervin and Hunter remained in Jefferson City for a few days. Eventually, however, they decided to use the Lincoln as a getaway car in their ongoing scheme to improve their finances. They drove the Lincoln to Paducah, Kentucky, and spent several days driving up and down Highway 60 in search of a bank to rob.

On December 19, 1988, a crew from the Union Pacific Railroad found a body near Marion ultimately identified as Richard Hodges. A post-mortem examination showed that Richard died of suffocation. Following the discovery of Richard's body, law enforcement authorities obtained a search warrant for the Hodgeses' home and executed it the same day. They found the badly decomposed body of Mildred Hodges wrapped in trash bags on the living room floor. An autopsy revealed that she died either from suffocation or from a heart attack.

When Ervin and Hunter learned that the Hodgeses' bodies had been discovered, they abandoned the Lincoln at a Thrifty Inn in Pudacah, Kentucky, and returned to Jefferson City. Continuing their efforts to find a bank to rob, they made several trips between Jefferson City and Florida for that purpose. On December 31, 1988, they met with Dennis Woodrum and Anne Tepo, two Florida acquaintances. As a "late Christmas present," Hunter gave Tepo a bag of woman's jewelry. That bag contained a ring belonging to Mildred Hodges.

On January 4, 1989, Ervin and Hunter split up. Hunter remained in Florida; Ervin returned to Jefferson City. Ervin later telephoned Hunter and expressed concern that there might be some incriminating evidence in the abandoned Lincoln. Ervin returned to Pudacah, and sometime during

the night of January 14–15, he set fire to the Lincoln in the parking lot of the Thrifty Inn.

On the strength of this evidence, a large portion of which came from the testimony of Ervin's co-conspirator, Bert Hunter, the jury found Ervin guilty and recommended death. The trial court sentenced Ervin to death.

Ervin filed a timely motion under Rule 29.15. Following an evidentiary hearing, the trial court issued findings of fact and conclusions of law overruling Ervin's motion.

## II. VOIR DIRE ISSUES

Ervin raises several points of error focusing on the jury selection process.

### A.

■ First, Ervin claims that the court *plainly erred* in allowing the prosecutor to ask venirepersons if they could act as the jury foreperson, in light of the fact that the foreperson is the only juror who signs his or her name to the verdict form for death. He claims that this question sought a commitment from the jurors to impose death. Review is under Rule 30.20.

This issue was squarely addressed and rejected in *State v. McMillin*, 783 S.W.2d 82, 92 (Mo. banc 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). The point is denied.

### B.

During *voir dire*, the prosecutor asked the venire panel the following question:

> Let me ask you this: You got to see Mr. Ervin for a minute there. Is there anybody here on the panel who thinks that a murderer looks a certain way, you know, that the gleam in the eye or the fact that Mr. Ervin is here dressed in a three-piece suit, that that somehow is that a person in a three-piece suit wouldn't go around murdering a 75–year–old lady or a 49–year–old man?

Ervin now claims that the trial court *plainly erred* in permitting the prosecutor to ask the venire panel this question. He claims that the question is argumentative, shifted the burden of proof, sought a commitment from the jury, and eroded the presumption of innocence. Review is under Rule 30.20.

■ A defendant's attire at trial, and his or her overall appearance, are wholly irrelevant to the ultimate question of his or her guilt or innocence. The prosecutor's challenged inquiry sought to determine which venirepersons, if any, were likely to give improper credence to irrelevant factors in their deliberation of Ervin's guilt or innocence. Such an inquiry is legitimate during *voir dire*. The point is denied.

### C.

■ Ervin contends that the court *plainly erred* in sustaining the State's challenges for cause to certain venirepersons who expressed reservations about the death penalty during the "death qualification" phase of *voir dire*. Review is under Rule 30.20.

Venirepersons may not be excluded "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Gray v. Mississippi*, 481 U.S. 648, 657, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). The relevant standard is "whether the juror's views would 'prevent or substantially impair the performance·of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. at 844, 852, 83 L.Ed.2d 841 (1985), *quoting Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). Only those jurors "irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings" are properly excluded from the panel for cause. *Gray*, 481 U.S. at 657–58, 107 S.Ct. at 2050–52.

Here, in response to questioning from the prosecutor, each of the challenged venirepersons affirmatively responded that his or her opinions and beliefs would preclude him or her from considering death as a

possible punishment. The trial court did not err and, therefore, did not commit plain error in finding that these jurors were not qualified to sit on a jury in which the State sought the death penalty. The point is denied.

### D.

Ervin argues that the trial court erroneously overruled his motion to strike certain venirepersons for cause. This Court has consistently held that "a defendant is entitled to a full panel of qualified jurors before making peremptory challenges and even though an unqualified juror does not actually serve, it is prejudicial error to fail to sustain a meritorious challenge for cause." *State v. Schnick*, 819 S.W.2d 330, 333 (Mo. banc 1991). We must therefore determine whether Ervin's challenges to these prospective jurors for cause were meritorious.

■ To qualify as a juror, the venireperson must be able to enter upon that service with an open mind, free from bias and prejudice. *State v. Walton*, 796 S.W.2d 374, 377 (Mo. banc 1990). The trial court has broad discretion in determining the qualifications of a prospective juror. The trial court's ruling will not be disturbed on appeal unless it is clearly erroneous. *State v. Leisure*, 749 S.W.2d 366, 371 (Mo. banc 1988).

### 1.

■ Ervin first claims that the trial court erred in failing to sustain his motion to strike venireman Rogers for cause. The basis of Ervin's contention centers on venireman Rogers' knowledge of the victims and his having worked with one of the State's witnesses. The relevant portion of Rogers' *voir dire* follows:

MR. CALLAHAN (for the State): [I]s there anyone here in the panel who either knew Richard or Mildred?

\* \* \* \* \* \*

VENIREPERSON ROGERS: Yes. I knew him about 35 years ago as just neighbors in a small community.

MR. CALLAHAN: Okay. To your knowledge had you run into him or had any dealings with him in the last 35 years?

VENIREPERSON ROGERS: I hadn't seen or heard about him other than through the realty company through the newspaper or whatever.

MR. CALLAHAN: Ads?

VENIREPERSON ROGERS: Yeah.

MR. CALLAHAN: Anything about that—

VENIREPERSON ROGERS: No, sir.

MR. CALLAHAN: —long time ago relationship that would affect your ability to be fair and impartial?

VENIREPERSON ROGERS: No, sir.

\* \* \* \* \* \*

MR. ENG (for Ervin): If any of you know these people, please indicate. Kenneth Ledbetter. He's with the Missouri State Highway Patrol. Okay, Mr. Rogers.

\* \* \* \* \* \*

VENIREPERSON ROGERS: I know who he is, uh-huh.

MR. ENG: And in what connection?

VENIREPERSON ROGERS: Through school.

MR. ENG: Through school?

VENIREPERSON ROGERS: In counseling with students.

MR. ENG: You mean he comes there and talks or something?

VENIREPERSON ROGERS: Well, he does that occasionally I think probably, but I've worked with him on one particular instance.

\* \* \* \* \* \*

MR. ENG: Okay. All right. Now, if he testifies in this case, because you know him and he spoke at the school, I mean, would you use the same yardstick [to evaluate the witness' testimony as other witnesses] I guess we're back up to?

VENIREPERSON ROGERS: Sure, definitely.

Ervin's two-sentence argument on appeal is that Rogers' mere acquaintance with the

victim, no matter how remote in time or superficial, is sufficient to disqualify Rogers. We disagree.

Far from revealing prejudice, the record is unequivocal in showing Rogers' own belief that he could judge this case fairly and without prejudice. Mr. Rogers had not seen Richard Hodges for thirty-five years. He testified that this remote and superficial acquaintance would not affect his ability to serve as a fair and impartial juror. He further testified that his acquaintance with Officer Ledbetter would not cause him to evaluate Officer Ledbetter's testimony differently than any other witness. On this record, the trial court cannot be convicted of error in failing to sustain Ervin's motion to strike Rogers for cause. The point is denied.

### 2.

■ Ervin next devotes two sentences to his claim that the trial court erred in failing to sustain his motion to strike venireperson Watts for cause. Ervin contends Watts demonstrated a potential inability to follow the law and instructions. We assume Ervin's contention stems from the following exchange between the trial court and the venire panel:

THE COURT: All right. Now, let me ask one other question of you just to get it very quickly. I need to know about prior experience as a juror. I want to know if you've ever been a juror in any kind of a case in any kind of a court anyplace in the world before you came in here today. So that's as broad as I know how to make the question. Let me run it through real quick. Mr. Rogers, how long ago was it?

VENIREPERSON ROGERS: About five years I think, sir.

THE COURT: Do you remember what kind of a case it was?

\* \* \* \* \* \*

THE COURT: All right, sir. I don't want to know what the jury did, but did the jury reach a result?

VENIREPERSON ROGERS: We did.

\* \* \* \* \* \*

THE COURT: Okay. And Mr. Watts.

VENIREPERSON WATTS: Yes. I was on a jury a couple years ago. It was a couple prisoners.

THE COURT: All right.

VENIREPERSON WATTS: In Jeff City. We found him guilty.

THE COURT: I don't want to know what the jury did. All I want to know is whether the jury reached a result.

VENIREPERSON WATTS: What did you say?

THE COURT: Yes, sir. Mr. Smith.

When questioning Rogers about his previous jury experience, the trial court told Rogers not to disclose what "the jury did." When answering the court's question to him, Watts volunteered information as to what the jury on which he served "did." Dressed to the nines, Ervin's argument seems to be that Watt's failure to generalize the trial court's specific instruction to Rogers to his own responses shows an inability to follow the trial court's instructions in every circumstance. Leaving aside for the moment a lay person's expected unfamiliarity with technical aspects of *voir dire* and natural nervousness at serving on a jury, Watts' response shows a desire to be totally forthcoming in responding to the trial court's question. Aside from the fact that the information Watts volunteered was surely useful to the defense in knowing Watts' previous experience as a juror in a criminal case, it does not show any general inability in Watts to follow the Court's instructions. Ervin's argument as to Watts is sparse because it is empty. The trial court did not err in overruling Ervin's motion to strike venireman Watts for cause. The point is denied.

### 3.

Finally, Ervin claims that the trial court erred in failing to sustain his motion to strike venireman Crane for cause. Ervin asserts that Crane violated his duty to answer fully, fairly and truthfully.

When counsel asked the panel whether anyone had been a victim of a crime, Crane responded in the affirmative. He reported that his car had been stolen a year and a

half ago, and that it had not yet been recovered. Ervin's counsel inquired no further on this subject during *voir dire*. However, during the conference on strikes for cause, defense counsel claimed that Crane's store had been burglarized on several occasions.

The burden is on the party proposing the strike to probe into any area on *voir dire* which he considers grounds for disqualification. *State v. Clemmons,* 753 S.W.2d 901, 907 (Mo. banc 1988), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). Ervin's unsupported claim that Mr. Crane's store had been burglarized does not prove itself. Without more than counsel's bare assertion, the trial court cannot be convicted of error in failing to sustain the motion to strike Crane. Nor can Crane be convicted of failure to respond fully when defense counsel did not inquire further. The point is denied.

### E.

Ervin next contends that the trial court erred in failing to grant his request for individual *voir dire* and sequestered *voir dire,* because several venirepersons had been exposed to pretrial publicity.

This Court has rejected the claim that individual *voir dire* is necessary in death penalty cases. Whether to conduct *voir dire* individually or in small groups is a matter within the control of the trial court and is not a basis for reversal of a conviction absent a showing of both an abuse of discretion and actual prejudice to the defendant. [Citations omitted.] *McMillin,* 783 S.W.2d at 94–95.

The record reveals no arguable, much less actual, prejudice to Ervin from the trial court's decision to eschew individual *voir dire.* The point is denied.

### F.

Ervin claims that the trial court erred in failing to sustain his motion to empanel a second jury for the penalty phase of the trial. This issue has been addressed and rejected by this Court. *State v. Kilgore,* 771 S.W.2d 57, 63 (Mo. banc 1989), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). The point is denied.

### III. TRIAL ISSUES

We next address Ervin's several points and subpoints relating to the conduct of the trial.

### A.

Ervin challenges the admission into evidence of various photographs of the victims. He claims that the prejudicial effect of the photographs far outweighed any probative value they may have had.

The trial court is vested with broad discretion in the admission of photographs, although that decision may be overturned if it constitutes an abuse of discretion. Missouri courts have allowed admission into evidence of photographs to corroborate the testimony of a witness to assist a jury better to understand the facts and testimony of witnesses, and to prove an element of the case. These standards apply although the photographs may be gruesome. [Citations omitted.] *McMillin,* 783 S.W.2d at 101.

### 1.

Ervin's first attack is against photographs of Richard Hodges' body taken at the time of its discovery. They show duct tape covering his nose and mouth; they show his hands bound behind his back with duct tape. The photos also show Richard's body in an isolated area near railroad tracks. These photographs corroborate the testimony of Bert Hunter, the State's principal witness. Hunter testified that he and Ervin bound Richard Hodges with duct tape and dumped his body by railroad tracks near Marion, Missouri. Because Hunter had given previous accounts of the murders that did not implicate Ervin, Hunter's credibility was clearly at issue. These photographs corroborate Hunter's testimony. The trial court did not abuse its discre-

tion in admitting these photographs. The point is denied.

### 2.

▮ Ervin focuses next on photographs that show a human form in trash bags taped together with duct tape, lying on the floor of the Hodgeses' home just off the living room. One photograph shows the body of Mildred Hodges after she had been removed from the trash bags.

Hunter testified that he and Ervin placed Mildred Hodges in trash bags, fastened the bags together with duct tape, and moved her body from the hallway toward the living room before they abandoned their plan to carry her body away. These photographs corroborate Hunter's challenged testimony. The trial court did not abuse its discretion in admitting these photographs. The point is denied.

### 3.

▮ Ervin's third challenge is to photographs depicting the unclothed, decomposed body of Mildred Hodges on the autopsy table. The trial court admitted three photos over timely objection because Mildred's cause of death was at issue and because the photos would assist the jury in understanding the testimony of Dr. Dix, the medical examiner. Dr. Dix had testified that he could not state the cause of Mildred's death with certainty because her body was badly decomposed. The court did not abuse its discretion in admitting these photographs. The point is denied.

### B.

▮ Ervin next assigns error to the failure of the trial court to declare a mistrial *sua sponte* when the State elicited testimony from Bert Hunter that Ervin acquired a shotgun following the murder of Mildred and Richard Hodges. Ervin also asserts that the trial court erred in overruling Ervin's objections to the testimony of two subsequent witnesses who corroborated Hunter's testimony regarding the shotgun.

### 1.

This record shows that in an apparent attempt to lead Hunter away from offering testimony about other crimes he and Ervin committed together in the December, 1988—January, 1989 period, the State began asking Hunter leading questions on direct examination. Ervin's counsel objected. To avoid leading its witness, the State then inquired directly:

Q. [By Mr. Callahan for the State] After you abandoned the Lincoln. Let's go step by step until—

A. Okay. After we abandoned the Lincoln, we had came back to Jefferson City. But at that point had no getaway car. So at that point we needed a gun. I think at that point sometime this time frame, I'm not exactly sure when it was, Tommy acquired a shotgun from a pickup truck in Jefferson City. And we were still driving up and looking at banks on Highway 60.

MR. ENG: Your Honor, I'm going to object what relevance this would have to the crime that this jury has to deal with, whether or not he had a shotgun, I object. It is irrelevant.

MR. CALLAHAN: Well, Judge, the objection was I'm leading. I was trying to get through this period and you kept objecting to that.

MR. ENG: Well, my objection is—

THE COURT: Mr. Eng.

(Counsel approached the bench and the following proceedings were had:)

THE COURT: He has twice tried to ask them when he split up and get away from this and you object to that. You're right it is leading. Now it's either going to have to—

MR. ENG: What are you trying to get at?

MR. CALLAHAN: I'm trying to skip through criminal enterprise because on January 5th after they've robbed the bank they split up. He goes back to Florida and Tommy goes to Missouri.

MR. ENG: Why don't you just ask him when he goes to Florida.

MR. CALLAHAN: Because he's liable to say "Right after we robbed the bank."

MR. ENG: Was there a period of time that you went to Florida?

MR. CALLAHAN: They went down and did a burglary in Florida on New Year's Day.

MR. ENG: So he says.

MR. CALLAHAN: That's what his answer is going to be. Do you want me to do it that way I tried to and get through this?

MR. ENG: Go back the way you were.

First, Ervin's counsel invited Hunter's testimony by objecting to the leading questions. In a later response to Ervin's motion for a mistrial prior to cross-examination of Hunter, the trial court accurately said:

> Each time that you've requested that I sustain the objection, I've done that. There has been no request for me to instruct the jury to disregard any answer. Granted all of the relief. I will not grant the mistrial. The prosecutor asked a question about "After you separated or split on January the 5th, 1989," defense objected that that was leading. I sustained it. He then asked him what happened next. I have to presume that the defense was aware of what that was going to lead to if you went by direct examination.

Second, defense counsel's objection did not go to the State's question; instead, it focused on the relevancy of Hunter's answer. As to the State's questioning, counsel conceded that leading questions might avoid Hunter's reference to other crimes. As to Hunter's answer, Ervin's counsel did not request that the trial court do anything but permitted the State to continue its inquiry.

We review for plain error under Rule 30.20. Plain error exists and a reversal is required only when the court finds that a manifest injustice or a miscarriage of justice has occurred. Rule 30.20. *Kilgore*, 771 S.W.2d at 67.

■ "As a general rule evidence of uncharged crimes is inadmissible unless that evidence has a 'legitimate tendency to establish defendant's guilt of the crime charged.'" *State v. Kenley*, 693 S.W.2d 79, 81 (Mo. banc 1985), *quoting State v. Williams*, 652 S.W.2d 102, 110 (Mo. banc 1983). This "bad guy evidence," is admissible, however, where the subsequent crime is part of a crime or series of crimes planned or contemplated from the beginning. *State v. Sladek*, 835 S.W.2d 308, 315 (Mo. banc 1992) (Thomas, J. concurring).

The State's direct examination of Hunter elicited a general response describing the peripatetic movements he and Ervin undertook following the Hodgeses' murders. These "activities" were consistent with the plan Ervin and Hunter discussed prior to killing the Hodgeses. Thus, Hunter's testimony that "[Ervin] acquired a shotgun from a pickup truck in Jefferson City" is consistent with the duo's initial purpose to pursue a course of crime to obtain money.

We find no manifest injustice or miscarriage of justice here. Given the wide-ranging criminal activity Ervin and Hunter planned, of which the Hodgeses' murders were but the initial step, Ervin's acquisition of the shotgun is an expected part of Ervin and Hunter's pre-planned scheme. It is thus without prejudicial impact.

## 2.

■ Two other witnesses for the State, Anna Marie Tepo and Dennis Woodrum testified that they, too, saw the shotgun. Ervin's counsel objected to the relevancy of this "shotgun" testimony. The trial court overruled Ervin's objections. As discussed in the previous section, Hunter testified for the State at great length as to the crime spree he and Ervin planned and pursued. Although the shotgun was not used in the commission of the Hodgeses' murders, it was intimately connected to Ervin and to Ervin's and Hunter's continuing scheme to obtain relief from their financial difficulties. For this reason, the testimony of Tepo and Woodrum is admissible in its own right; it shows Ervin's continued participation in the series of crimes he and Hunt-

er contemplated from the beginning.[2] The point is denied.

### C.

Ervin also raises several additional points of *plain error* relating to various witnesses' references to "bad" acts and crimes he allegedly committed, which, he contends, either individually or cumulatively prejudiced him. The plain error rule does not justify a review of every trial error that has not been properly preserved for appellate review. *McMillin*, 783 S.W.2d at 98. This Court will not review obviously meritless claims. Colorably meritorious issues have already been considered. These remaining plain error points are denied as they are obviously without merit.

### D.

Ervin claims that the trial court erred in permitting the State to present the testimony of Bert Hunter. Hunter, the State's principal witness, provided the only direct evidence of Ervin's involvement in the Hodgeses' murders. Ervin argues that the trial court permitted Hunter's testimony in violation of its own discovery orders and erred in so doing.

Ervin filed a discovery motion prior to trial that requested, among other things, that the State reveal any agreement it had made or would make with any witness in return for that witness' testimony. The trial court sustained the motion and ordered the State to reveal to Ervin any deal, agreement or understanding that the State had with any potential prosecution witness or informer on December 29, 1989. On that same date, the court issued an order to prohibit the use of any evidence not disclosed by one side to the other by January 12, 1990. The trial began on January 17, 1990.

On July 21, 1989, Bert Hunter pled guilty to two counts of first degree murder in connection with the Hodgeses' murders. On November 22, 1989, almost two months before Ervin's trial began, the State endorsed Bert Hunter as a witness in Ervin's trial. This endorsement put Ervin on notice that Hunter might be called as a witness by the State. Approximately one week before trial and within the time permitted by the trial court, the prosecutor orally told Ervin's counsel that the State had reached no agreement with Hunter at that time. The prosecutor further told Ervin's counsel that the State had offered Hunter an agreement not to use Hunter's testimony at Ervin's trial in Hunter's subsequent hearing to determine his punishment for the Hodgeses' murders.

Ervin's trial began as scheduled on January 17, 1990. Around 4:00 p.m. that day, Hunter agreed to the deal previously offered by the State of which Ervin's counsel had knowledge. The State disclosed the finalized agreement to Ervin's counsel shortly before 7:00 p.m., when Hunter took the stand. Ervin's counsel strenuously argued that the disclosure of the agreement at this late date violated the trial court's previous discovery orders.

Assuming for the sake of argument—and no more—that permitting Hunter's testimony violated the court's discovery orders, Ervin was not prejudiced. "The basic object of the discovery process is to permit the defendant a decent opportunity to pre-

---

**2.** Cases cited by Ervin on this point are inapposite. In *State v. Perry*, 689 S.W.2d 123 (Mo.App. 1985), the court of appeals remanded defendant's conviction for second degree robbery on the basis of an improperly admitted shotgun. In Perry, the court noted that "weapons unconnected with either the accused or the offense for which he is standing trial lack any probative value and their admission into evidence is inherently prejudicial and constitutes reversible error." *Id.* at 125. Here, the shotgun was clearly connected to Ervin, corroborates Hunter's challenged testimony, and relates squarely to the continuing criminal activity of Ervin and Hunter.

In *State v. Charles*, 572 S.W.2d 193 (Mo.App. 1978), the State vigorously pressed defendant during cross-examination for specific details concerning an earlier arrest for carrying a concealed weapon. The court of appeals noted that the record contained no evidence indicating that the defendant had ever been convicted of carrying a concealed weapon. The court appropriately indicated that defendant's negative answer to the prosecutor's question should have ended the matter.

pare in advance of trial and avoid surprise." *Kilgore*, 771 S.W.2d at 66.

Ervin knew that the State contemplated calling Hunter as a witness. Ervin knew that Hunter's prior statements had not consistently implicated him, Ervin, in the Hodgeses' murders. Ervin knew the nature of the agreement the State offered Hunter in return for Hunter's testimony. Ervin's only surprise could have been that Hunter agreed to the State's offer.

The record shows that this "surprise" did not limit the effectiveness of Ervin's cross-examination. Indeed, at Ervin's Rule 29.15 hearing, Ervin's counsel acknowledged that he was prepared to cross-examine Hunter. The trial court did not err in permitting Hunter to testify. The point is denied.

### E.

 Ervin next claims that the trial court erred in denying his motion for judgment of acquittal and motion for new trial. He argues that there was no credible evidence upon which the jury could find the elements of deliberation and Ervin's participation in the offenses as the basis for its verdicts.

The evidence as to these elements of deliberation and Ervin's participation in the murders was principally provided by the testimony of Bert Hunter. At Hunter's guilty plea hearing Hunter said that Ervin was not his accomplice. At trial, however, he said that Ervin was his accomplice and that he, Hunter, had lied when he entered his guilty plea. At the hearing on Ervin's motion for a new trial, Hunter said that he lied at trial and that Ervin was not his accomplice in the Hodgeses' murders.

"[T]estimony of a single witness may be sufficient to constitute substantial evidence to make a submissible case." *State v. Williams*, 652 S.W.2d 102, 111 (Mo. banc 1983). Hunter's credibility at trial was a question for the jury to decide. The jury found Hunter credible. The point is denied.

### F.

 Ervin peppers his brief with additional allegations of *plain error*. These relate to the prosecutor's closing arguments; the prosecutor's cross-examination of Ervin during the penalty phase; defense counsel's efforts to befriend the jury by stipulating to foundational facts and commenting that he will "try to shorten this up" so as to get to the heart of a witness' testimony quickly; and the court's efforts to find jurors who would not suffer any hardships by commenting to them that this case "will be tried this week." None of these claims were the subject of an objection at trial, and none were included in Ervin's motion for new trial. Review is under Rule 30.20.

We have reviewed the claims *ex gratia* and find that none rises to the level of manifest injustice or a miscarriage of justice. These points are denied.

## IV. INSTRUCTIONAL ISSUES

Ervin raises eight points of instructional error.

### A.

 Ervin first claims that the court *plainly erred* in failing to instruct on the lesser-included offense of second degree murder. At the instruction conference the following exchange occurred between the trial court and Mr. Eng, Ervin's trial counsel:

THE COURT: Now, let the record reflect that the court has indicated a willingness to instruct on in Count I second degree murder and on second degree murder in Count II and that defense has specifically requested that the instruction not be given on either of those counts; is that correct?

MR. ENG: Our client informs us that that is his desire, Judge.

THE COURT: And is that your request to the Court?

MR. ENG: That is our request.

\* \* \* \* \* \*

THE COURT: Mr. Eng has represented that the defendant has specifically instructed him not to instruct on second degree murder.

Mr. Eng, I likewise presume for the record that that would apply to the giving of an instruction on manslaughter as well, is that correct, which is a lesser offense?

MR. ENG: That's true.

THE COURT: Of second degree. In other words, as I understand it, the defense only wants the jury instructed on first degree murder on Counts I and II.

MR. ENG: That's what he says.

THE COURT: Very well.

*Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980), holds that in a capital case, the submission of a lesser included offense instruction is necessary for a fair trial; this is so, the Court reasoned, because the fact-finding process becomes distorted when the jury is forced into an all-or-nothing choice between capital murder and innocence. The *Beck* rule has exceptions, however. The Supreme Court has specifically left defendants the option to waive their right to a lesser included offense instruction:

Although the *Beck* rule rests on the premise that a lesser included offense instruction in a capital case is of benefit to the defendant, there may well be cases in which the defendant will be confident enough that the State had not proved capital murder that he will want to take his chances with the jury. If so, we see little reason to require him ... to give the State what he perceives as an advantage—an opportunity to convict him of a lesser offense if it fails to persuade the jury that he is guilty of capital murder.

*Spaziano v. Florida,* 468 U.S. 447, 456–57, 104 S.Ct. 3154, 3160–61, 82 L.Ed.2d 340 (1984); *Love v. State,* 670 S.W.2d 499 (Mo. banc 1984).

Under *Spaziano,* Ervin's waiver was constitutionally permissible. Ervin's life was at stake; he chose to "take his chances with the jury." We will not interfere with such a gamble unless Ervin's waiver was not knowingly and intelligently made. Ervin makes no allegation, however, that his waiver was not knowingly and intelligently made. Indeed, the record indicates that Ervin knew of his options and specifically

requested that no lesser included offense instruction be submitted to the jury. Under these circumstances, the waiver is constitutionally valid. The point is denied.

### B.

Ervin next claims that the trial court erred in submitting instructions 5 and 7, the verdict directing instructions for the two murder counts. Instruction 5, which follows in pertinent part, is essentially the same as Instruction 7.

[I]f you find and believe from the evidence beyond a reasonable doubt:

First, that ... Bert L. Hunter caused the death of Richard/Mildred Hodges by suffocating him/her, and

Second, that it was Bert L. Hunter's purpose to cause the death of Richard/Mildred Hodges, and

Third, that *defendant* did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of the death of Richard/Mildred Hodges, *the defendant,* after deliberation, aided or encouraged Bert L. Hunter in causing the[ir] death, then you will find the defendant guilty ... of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

[Emphasis added.] Ervin argues that the instructions deviate from MAI–CR and states, conclusionally and without assisting the Court with supporting argument, that the submission of these instructions prejudiced him.

▮ Whenever there is an MAI–CR instruction applicable under the law and Notes On Use, the MAI–CR instruction is to be given to the exclusion of any other

instruction. Rule 28.02(c). The giving or failure to give an instruction in violation of this rule or any applicable Notes On Use constitutes error, its prejudicial effect to be judicially determined. Rule 28.02(f).

■ Ervin's guilt was premised on accessory/accomplice liability. Instructions 5 and 7, the verdict directors, were patterned after MAI–CR 3d 304.04—"Defendant's Responsibility For Conduct of Another Person." The only conduct ascribed to Ervin in these instructions was that he aided or encouraged Bert Hunter in causing the Hodgeses' deaths. "Where … the sole basis for defendant's liability is his aiding the other person … *all the elements of the offense* should be ascribed to the other person … and not to the defendant." [Emphasis added.] MAI–CR3d 304.04, Note On Use 7(a).

There are three elements to the crime of murder in the first degree: "A person commits the crime of murder in the first degree if he [1] knowingly [2] causes the death of another person [3] after deliberation upon the matter." Section 565.020. Here, the instructions ascribed to Bert Hunter the elements of knowingly and purposely causing the Hodgeses' death, but the element of deliberation was never ascribed to him. The failure to ascribe to Hunter *all* the elements of murder in the first degree was a deviation from MAI–CR3d 304.04, Note On Use 7(a) and constitutes error.

The Court must now consider the prejudicial effect of this error. Deliberation distinguishes first-degree murder from second-degree murder. *See* Sections 565.020 and 565.021. Thus, a first-degree murder instruction premised on accessory liability must ascribe deliberation to the defendant. And where the State's theory is accomplice/accessory liability, the jury must also find that the defendant had a purpose to aid another in the commission of the crime.

■ MAI–CR3d 304.04, Note On Use 8(b), discusses two possible methods by which to submit deliberation:

If in using MAI–CR3d 304.04 [deliberation] is ascribed to the defendant alone or to the defendant *and* the other person or persons, the requirement of finding that the defendant "deliberated" is satisfied. *If, however, this element is not ascribed to the defendant but is ascribed solely to another person (as would be the case where the defendant did not perform any other conduct which caused the death and the defendant's liability is based solely on his aiding the person who caused the death),* then it is suggested that the ascription of that mental state to the defendant should be accomplished by [including it in the "aid and encourage" submission].

[Emphasis added.] This Note On Use is primarily concerned with how to ascribe deliberation to the defendant, and its directions in this regard are accurate. The Note, however, erroneously suggests that in a case in which the "defendant's liability is based solely on his aiding the person who caused the death," the element of deliberation must also be ascribed to the other person. This suggestion overlooks the possibility that two murderous actors may have differing mental states, although they act together. A defendant, in a state of cool blood, may promote a murder by aiding a person who kills in the heat of passion. Such a defendant would be guilty of murder in the first degree though the other person is guilty of a lesser offense. Section 562.051 specifically allows for such a result: "[W]hen two or more persons are criminally responsible for an offense which is divided into degrees, each person is guilty of such degree as is compatible with his own culpable mental state."

■ The State is thus not required to prove that a defendant's accomplice committed murder in the first degree in order to convict the defendant of murder in the first degree for his or her acts in aiding the commission of murder. *State v. Petary,* 781 S.W.2d 534, 539 (Mo. banc 1989), *vacated on other grounds,* 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), *aff'd on remand,* 790 S.W.2d 243 (Mo. banc 1990). That the verdict directors in this case failed to ascribe the element of deliberation to Hunter was a deviation from MAI–CR3d 304.04, but Ervin suffered no prejudice. It

was not necessary to submit the issue of Hunter's deliberation to the jury.

Ervin also claims that the verdict directors were erroneous in that they potentially misled and confused the jury about the actions each actor must be found to have taken. In paragraphs First and Second, the instructions submit that Bert Hunter purposely caused the death of the Hodgeses. In paragraph Third, the instruction says that *"defendant did so* after deliberation." [Emphasis added.] Paragraph Third asks the jury to consider someone's deliberation—either Hunter's (who is not the defendant in this case) or Ervin's—in the commission of the acts submitted in paragraphs First and Second. To the extent the instruction directed the jury to consider Hunter's deliberation, it was surplusage for the reasons previously stated. To the extent that the instruction can be read to require the jury to consider Ervin's deliberation, it is redundant. Paragraph Fourth also requires the jury to consider Ervin's deliberation.

Despite this error, Ervin suffered no prejudice as a result of the submission of Instructions 5 and 7. A defendant is prejudiced by an erroneous instruction when the jury "may have been adversely influenced by [it]." *State v. Lingar*, 726 S.W.2d 728, 738 (Mo. banc 1987), *cert. denied*, 493 U.S. 900, 110 S.Ct. 258, 107 L.Ed.2d 207 (1989), *quoting State v. Rodgers*, 641 S.W.2d 83, 85 (Mo. banc 1982). *See also State v. Williams*, 611 S.W.2d 26, 30 (Mo. banc 1981). Bert Hunter admitted at trial to his murderous acts, and these actions were properly ascribed to him in paragraphs First and Second of the instructions. Paragraph Fourth properly required the jury to find both Ervin's deliberation and his acts in aid and encouragement of Hunter in causing the Hodgeses' death. These submissions accurately state the law of accessory/accomplice liability for murder in the first degree. The point is denied.

### C.

Ervin contends that the court plainly erred in submitting instructions 4 and 15. These instructions are patterned after MAI–CR3d 302.04 and 313.30 respectively, and define proof beyond a reasonable doubt as "proof that leaves you firmly convinced of the defendant's guilt/truth of a proposition." Ervin argues that these instructions dilute the State's burden of proof.

This Court has recently re-examined this definition of reasonable doubt in light of the United States Supreme Court decision in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and found the definition constitutionally sound. *State v. Griffin*, 818 S.W.2d 278, 282 (Mo. banc 1991). We adhere to the position announced in *Griffin*. The point is denied.

### D.

Ervin next claims that the trial court erred in refusing to instruct the jury on circumstantial evidence, because the sole direct evidence as to his deliberation in the offense was unreliable. As Ervin concedes, however, the State presented direct evidence of Ervin's guilt in this case. An instruction on circumstantial evidence is only required where *all* of the evidence in the case is circumstantial. *State v. Mallett*, 732 S.W.2d 527, 536 (Mo. banc 1987), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987); MAI–CR3d 310.02, Note On Use 3. The point is denied.

### E.

Ervin devotes two points of his argument to an attack on the aggravating circumstances submitted to the jury during the penalty phase. The trial court submitted three aggravating circumstances to the jury pursuant to Section 565.032.2: (1) whether the defendant was convicted of murder on May 22, 1969, in the Circuit Court of Andrew County, Missouri; (2) whether the murder of Richard/Mildred Hodges was committed while the defendant was engaged in the commission of another unlawful homicide of Mildred/Richard Hodges; and (3) whether the murder of Richard/Mildred Hodges was committed while the defendant was engaged in the perpetration of robbery. The jury found

all three of the aggravating circumstances submitted.

### 1.

▮ Ervin's principal attack is against the first aggravator. He claims that it was unsupported by any evidence because he was never convicted of murder in May, 1969, in Andrew County. This is true; Ervin was not convicted of murder in May, 1969, in Andrew County. But Section 565.-032.2(1) does not require the jury to find the date and place of the defendant's prior murder conviction; it merely requires the jury to find that the defendant has "one or more serious assaultive criminal convictions." A certified record of his prior conviction, admitted into evidence, shows that he was convicted of second degree murder on January 31, 1969, in Buchanan County. This discrepancy between the dates and places is devoid of consequence; Ervin suffered no prejudice from the error. The jury correctly found that Ervin had a prior murder conviction. Ervin cannot dispute this essential fact.

▮ Ervin further complains that the first aggravator should have been struck because the prior conviction of murder was unconstitutionally obtained. He makes a host of claims to support the assertion that his prior conviction should have been vacated since it was based on an involuntary guilty plea induced by ineffective counsel. To the extent that such claims have merit, they should have been brought in Ervin's post-conviction motion following the 1969 conviction. *Ervin v. State*, 525 S.W.2d 381 (Mo.App.1975). Whatever challenge Ervin may have to his prior conviction is procedurally barred.

### 2.

▮ The second aggravator, authorized under Section 565.032.2(2), holds that the murder of Richard/Mildred Hodges was committed while Ervin was engaged in the commission of another unlawful homicide of Richard/Mildred Hodges. Ervin challenges the instruction as being unsupported by substantial evidence. In essence, Ervin argues that his accomplice Bert Hunter killed Richard, and that there is insufficient evidence to implicate Ervin with the intentional killing of Mildred.

Ervin's contention has no merit. According to evidence presented at trial, it was Ervin's plan to kidnap a person of means and force that person to withdraw money from his or her bank account. Both Hunter and Ervin agreed in advance that there would be no witnesses to the crime. To effect this purpose, Ervin purchased plastic trash bags from Wal–Mart which could be used to suffocate the occupants and remove their bodies from the premises. It was this plan of Ervin which was ultimately put into effect. Moreover, testimony indicates that during the commission of the crime, it was Ervin who initially put duct tape over Richard's mouth and nose in an effort to suffocate him. When Richard complained that he could not breathe, Ervin told him, "That's the general idea." Only after Richard made an unsuccessful attempt to break free, did Hunter assume the task of suffocating Richard. Ervin then turned his attention to Mildred; he placed a trash bag over her head and held it there until she lost consciousness. Clearly, there was sufficient evidence in the record for the jury to find that Ervin was engaged in the commission of another unlawful homicide.

### 3.

▮ Ervin's challenge of the third statutory aggravator, that the murder of Richard/Mildred Hodges was committed while the defendant was engaged in the perpetration of robbery, is equally without merit.

Ervin argues that Section 565.032.2(11) provides inadequate guidance to the jury because it does not distinguish between cases involving a defendant who was engaged in the perpetration or attempted perpetration of a designated felony during the murder in the first degree and cases in which a defendant, committing the same felonious act, might only be charged with second-degree murder. Ervin's comparison of the statutory aggravator with felony-murder is inapt because it fails to acknowl-

edge the requirement in Missouri that one must knowingly cause the death of another after deliberation in order to be convicted of a capital crime. Section 565.020.1. This requirement of deliberation renders moot Ervin's argument of inadequate guidance or possible confusion. Moreover, Section 565.032.2(11) genuinely and reasonably narrows the class of persons eligible for the death penalty in accordance with standards outlined in *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983). Nor does the aggravator create a substantial risk that the death penalty will be inflicted arbitrarily and capriciously. *See Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The point is denied.

### F.

Ervin assigns *plain error* to the submission of instructions 20 and 25, in the penalty phase of the trial. These instructions, patterned after MAI–CR3d 313.44, violate the teaching of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), according to Ervin. This is so, he argues, because the instructions could be understood by reasonable jurors to require a unanimous finding on each mitigating circumstance before that circumstance could be weighed against the aggravating circumstances to determine the appropriate punishment. We have repeatedly rejected this argument. *See, e.g., State v. Six,* 805 S.W.2d 159, 167 (Mo. banc 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991), and *State v. Petary,* 790 S.W.2d 243, 244–46 (Mo. banc 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 443, 112 L.Ed.2d 426 (1990). We continue to adhere to these views. The point is denied.

### G.

■■■ Ervin also claims that the submission of instructions 22 and 27, patterned after MAI–CR3d 313.48, was unconstitutional. Those instructions told the jurors that the trial court would fix Ervin's punishment if they could not agree on a punishment. Ervin claims that the instructions permitted the jurors to believe that they could avoid their responsibility for the sentencing decision. This argument, rejected by *McMillin,* 783 S.W.2d at 104, remains unpersuasive.

### V.

Having reviewed each of Ervin's allegations of error, we find that no prejudicial error occurred in his trial. The judgment of guilt is affirmed.

### VI. INDEPENDENT SENTENCE REVIEW

Section 565.035 requires us to review the death sentences imposed in this case to determine whether (a) the sentence of death resulted from the influence of passion, prejudice, or any other arbitrary factor, (b) whether the evidence supports the jury's finding of statutory aggravating circumstances and any other circumstance found, or (c) whether the death penalty is excessive or disproportionate to the penalty imposed in similar cases considering both the crime, the strength of the evidence and the defendant.

### A.

■■■ We have reviewed the record to determine whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 565.035.3(1). As shown by our previous discussion, Ervin had a fair trial, free from prejudicial error. Neither our review of the record nor Ervin's argument points to any colorable indication that the jury recommended death under the influence of any passion, prejudice, or any other arbitrary factor.

### B.

We have reviewed the record to determine whether the evidence supports the jury's findings of statutory aggravating circumstances. Section 565.035.3(2). As previously discussed, the jury found all three of the aggravating circumstances submitted. The jury found that Ervin had a prior conviction of murder in accordance

with Section 565.032.2(1). Court records admitted into evidence clearly show that Ervin was convicted of second degree murder in 1969. The jury also found that the murder of Richard/Mildred Hodges was committed while Ervin was engaged in the commission of the unlawful homicide of Mildred/Richard Hodges, Section 565.032.-2(2); and that the murder of Richard/Mildred Hodges was committed while Ervin was engaged in the perpetration of robbery pursuant to Section 565.032.2(11). After reviewing these findings we conclude that each aggravating circumstance was soundly established by the evidence.

### C.

■■■ We must finally determine whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant. Section 565.035.3(3).

Ervin claims that his indictment should have been quashed because the Missouri statutory scheme for the death penalty is rendered unconstitutional by this Court's refusal to engage in "meaningful" proportionality review.[3] Ervin's contention appears to be the product of three separate opinions of former Judge Charles Blackmar in which he argues that the Court has not adopted a standard for proportionality review. *See State v. Davis,* 814 S.W.2d 593, 606–609 (Mo. banc 1991) (Blackmar, J., concurring in part and dissenting in part); *cert. denied,* —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992); *State v. Powell,* 798 S.W.2d 709, 718–719 (Mo. banc 1990) (Blackmar, J., concurring in part and dissenting in part), *cert. denied,* —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991); and *State v. Grubbs,* 724 S.W.2d 494, 501–

02 (Mo. banc 1987) (Blackmar, J., concurring), *cert. denied,* 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987). In each of these cases, Judge Blackmar's agreement or disagreement with the majority on the affirmance of the death penalty appears to turn on whether aggravating circumstances found by the jury were of such an "aggravated" or "outrageous" nature as to warrant death. *Powell,* 798 S.W.2d at 719. (Blackmar, J., concurring in part and dissenting in part).

Even applying Judge Blackmar's proposed standard, this is a case in which "the defendant has carried out a planned killing for his own purposes. [T]hese are the most aggravated of the death penalty cases." *Id.* at 718–19 (Blackmar, J., concurring in part and dissenting in part). As such, this case is similar to *State v. Leisure,* 749 S.W.2d 366 (Mo. banc 1988); *State v. Gilmore,* 697 S.W.2d 172 (Mo. banc 1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984); *State v. Sloan,* 756 S.W.2d 503 (Mo. banc 1988), *cert. denied,* 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236 (1989); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). The death sentence here was proportional to the penalty imposed in similar cases.

We affirm Ervin's death sentence.

### VII. RULE 29.15 ISSUES
### A.

■■■ Ervin appeals the denial of his Rule 29.15 motion for post-conviction relief. In this proceeding, Ervin has the burden of

---

**3.** Ervin also claims that the indictment should have been quashed because the statutory scheme for the death penalty is unconstitutional in that it vests unrestricted and unprincipled discretion in the prosecutor to decide against whom to seek the death penalty. He further claims that this discretion is an unconstitutional injection of the prosecutor into the exclusive province of the judiciary to sentence defendants. These issues have been addressed and recently rejected by this Court. *State v. McMil-*

*lin,* 783 S.W.2d 82, 101–02 (Mo. banc 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990).

Ervin further claims that the indictment should have been quashed because the death penalty is unconstitutional in that it is unjustified as a means of achieving any legitimate governmental goal. We continue to reject the assertion that the death penalty constitutes cruel and unusual punishment.

proving his grounds for relief by a preponderance of the evidence. Rule 29.15(h). This Court's review of a denial of post-conviction relief is limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous. Rule 29.15(j). The trial court's findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Amrine v. State,* 785 S.W.2d 531, 533 (Mo. banc 1990), *cert. denied,* ── U.S. ──, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990).

Ervin timely filed a *pro se* motion for post-conviction relief pursuant to Rule 29.-15. On August 17, 1990, the motion court appointed the Public Defender's office to represent movant. Appointed counsel filed an entry of appearance on September 11, 1990. On that date, motion counsel asked for a thirty-four day extension. The motion court, exceeding the authority of Rule 29.15(f), allowed counsel until October 20, 1990, to file an amended motion. Counsel filed the amended motion on October 22, 1990,[4] out of time. The motion court ruled on the merits of all of Ervin's timely and untimely claims in its findings and conclusions of law.

### B. Abandonment by Counsel

Oddly, Ervin argues that the motion court clearly erred in considering his 29.15 claims. He reasons that because the amended motion was not timely filed, his counsel abandoned him. Ervin argues that this "abandonment" merits reversal and remand for appointment of new counsel, the filing of a proper and timely amended motion, and a new hearing on Ervin's claims.

 Ervin correctly notes that the failure of post-conviction counsel to comply with the time requirements of Rule 29.15(f) constitutes a form of "abandonment" by post-conviction counsel. *Sanders v. State,* 807 S.W.2d 493 (Mo. banc 1991). The prop-

er forum to address claims regarding the failure of post-conviction counsel to comply with the time requirements of Rule 29.15(f) is in the circuit court where the motion is being prosecuted by movant. *Sanders,* 807 S.W.2d at 495. The motion court, however, shall order relief only where the movant is free of responsibility for the failure to comply with the requirements of the rule. *Id.* If the untimeliness of the amended motion is the exclusive result of counsel's action or inaction, the court shall consider the amended motion as having been timely filed and proceed according to the provisions of the rule. *Id.*

 In most circumstances, remand is proper so that the motion court may determine the cause of the untimeliness. However, where motion counsel admits in a motion for the extension of time that the delay was precipitated entirely by a burdensome caseload, no inquiry by the motion court is necessary. The record is barren of any indication that Ervin had any part in causing the five-day delay. Furthermore, as indicated, Ervin's counsel presented evidence on the amended claims at the evidentiary hearing; the 29.15 court rule on the merits of *all* of the claims in Ervin's amended motion including those filed late. Remand to the motion court would serve no purpose beyond delay. The point is denied.

### C.

 Ervin also alleges ineffective assistance of *post*-conviction counsel. These myriad claims of ineffectiveness, however, are not cognizable under Rule 29.15. *Pollard v. State,* 807 S.W.2d 498 (Mo. banc 1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991). Only where motion counsel has completely abandoned movant has this Court remanded to the motion court. *See Sanders,* 807 S.W.2d at 493. Abandonment is not ineffective assistance. *Sanders* and *Luleff v. State,* 807 S.W.2d 495 (Mo. banc 1991). Allegations of ineffective assistance of

---

**4.** It is undisputed that under Rule 29.15(f), the trial court permitted counsel to adduce evidence on all aspects of the amended motion that should have been filed within sixty days of the date counsel is appointed. That date was October 17, 1990. Here, the amended motion was filed five days late.

post-conviction counsel are categorically unreviewable. *Pollard,* 807 S.W.2d at 502.

### D.

 Ervin also asserts that the motion court clearly erred in overruling his second motion to continue the evidentiary hearing.

The motion court is required to conduct a hearing on a post-conviction motion within sixty days of the date of the order granting a hearing. Rule 29.15(g). The motion court may continue the hearing upon a showing of good cause. Rule 29.15(h). Ervin filed his *pro se* motion on July 11, 1990. Motion counsel entered her appearance on September 11, 1990. The motion court set the hearing for November 6, 1990. Five days prior to the hearing date, movant requested and received a continuance until March 8, 1991. On February 5, 1991, however, original motion counsel withdrew from the case and was immediately replaced by a second attorney from the Public Defender's office. On February 8, 1991, movant's motion for a second continuance was overruled. On March 8, 1991, the 29.15 court conducted the hearing. Preceding the evidentiary hearing, motion counsel renewed his request for a continuance. The motion court denied the request, indicating that the amended motion had been filed since October, and that the Public Defender's office had been given more than adequate time to prepare.

The motion court conducted the hearing more than seven months after counsel filed the request for a hearing. Movant's second counsel had more than a full month to prepare for the hearing. Moreover, the Public Defender's office had been appointed to represent appellant for over seven months. Counsel had adequate opportunity to prepare for the hearing. The trial court did not abuse its discretion in overruling the second motion for a continuance. The point is denied.

### E.

 Ervin reiterates a time-worn and oft-rejected charge that the mandatory time limits established by Rule 29.15 are unconstitutional. *Day v. State,* 770 S.W.2d 692, 695 (Mo. banc 1989), *cert. denied sub nom. Walker v. Missouri,* 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989); *Pennsylvania v. Finley,* 481 U.S. 551, 559, 107 S.Ct. 1990, 1995, 95 L.Ed.2d 539 (1987). The time limitations contained in Rule 29.15 are reasonable and do not violate the constitution. They serve the legitimate end of avoiding delay in the processing of prisoner claims. *Day,* 770 S.W.2d at 695. The point is denied.

### F. Remaining Ineffective Assistance Claims

 Many of Ervin's claims of ineffective assistance of counsel were raised for the first time on appeal; they are procedurally barred and will not be considered here. *Amrine,* 785 S.W.2d at 535. We will review only those additional allegations properly raised in the original *pro se* motion or in the amended motion.

To prevail on his Rule 29.15 motion, Ervin must demonstrate that trial counsel's performance was deficient and that this deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To demonstrate prejudice, movant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Moreover, movant must overcome the underlying presumption that the challenged action might be considered sound trial strategy. *Id.* at 689, 104 S.Ct. at 2065; *Sanders v. State,* 738 S.W.2d 856, 858 (Mo. banc 1987). Finally, "a court need not determine the performance component before examining for prejudice. If it is easier to dispose of the claim on the ground of lack of sufficient prejudice, the reviewing court is free to do so." *O'Neal v. State,* 766 S.W.2d 91, 92 (Mo. banc 1989), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989).

### 1.

 Ervin alleges that his trial attorney was ineffective in failing to play a videotape of Hunter's guilty plea during the guilt phase of the trial. When he pled guilty to the Hodgeses' murders, Hunter

explained in detail the murders and told the court that Ervin was not his accomplice. Hunter declined to implicate anyone else.

At Ervin's Rule 29.15 hearing, Ervin's lead trial attorney testified that he discussed the merits of playing the videotape with the movant as well as with the entire defense team. Counsel recognized the vital importance of Hunter's testimony to the State's case and that the decision to introduce evidence from the videotape was critical. Ultimately, however, counsel chose to avoid a rehash of the grisly details of the two murders. Although the lead defense counsel did not personally view the videotape, he testified that he read the transcript and that his co-counsel viewed the tape and discussed its contents with him. Trial counsel also testified that while Ervin initially wanted to play the video, Ervin ultimately agreed with counsel that it should not be played. Beyond this, the jury had ample evidence to reject Hunter's testimony as inconsistent.

 The motion court found that defense counsel could reasonably decide not to reprise the story of the Hodgeses' deaths to the jury as a matter of trial strategy. This finding is not clearly erroneous. The reasonable choice of trial strategy by counsel is not a foundation for finding that counsel ineffective. *Sanders*, 738 S.W.2d at 858.

### 2.

Ervin also avers that his counsel was ineffective in failing to have Ervin present at all critical stages of the proceedings. He now asserts that it was prejudicial error for him to be absent from the instruction conference in which the decision was made to waive a second degree murder instruction.

 As previously indicated, Ervin does not claim that his decision to waive the second degree murder instruction was incorrectly stated by his counsel or that he made the decision to waive the instruction involuntarily or without knowledge of the consequences of that choice. Apparently Ervin's claim is that his attendance at the instruction conference somehow resulted in prejudice to him. This claim is stated conclusionally and is without merit. Ervin has failed to show any prejudice.

With respect to additional claims regarding the presence of the movant that are asserted in the amended motion, the motion court ruled that the movant failed to indicate any "particularized evidence concerning what stages of the proceeding the claim refers to." Under Rule 29.15(h) the "movant has the burden of proving his grounds for relief by a preponderance of the evidence." The motion court did not clearly err in its ruling. The point is denied.

### 3.

 Ervin argues that his trial counsel was ineffective for failing to conduct an adequate investigation of mitigating evidence and for the manner in which he presented mitigating evidence. Ervin contends in his brief that his childhood conditions, and additional witnesses who could have offered mitigating testimony, should have been investigated. There is no doubt that trial counsel has a duty to make a reasonable investigation of mitigating evidence or to make a reasonable decision that such an investigation is unnecessary. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. So, too, it is the responsibility of motion counsel to do more than make conclusional statements of ineffectiveness. The amended motion offers no factual bases to support its claim; the evidence before the motion court did not reveal any testimony or evidence that trial counsel failed to present. Thus, the motion court properly held that the movant failed to sustain his burden of proof with respect to this allegation.

### 4.

 Ervin also urges that counsel was ineffective for failing to investigate during pre-trial whether members of the grand jury and its indictment had been tainted by his acquaintance with one of its members and that person's animosity toward him. Ervin argues that he was prejudiced by defense counsel's failure to investigate this allegation. The amended motion also asserts that counsel failed to inquire into the validity of the indictment and also failed to challenge selection of the grand jury. The

post-conviction court held that movant failed to present *any* evidence in support of these claims, thus abandoning them. Again, movant has the burden of proving his grounds for relief by a preponderance of the evidence. Pure speculation as to what "evidence" might have been uncovered and its ultimate effect is not a proper basis for a conclusion that Ervin's counsel was ineffective. The motion court did not err on this point.

### 5.

■ Ervin also contends that the failure of the State to disclose all discoverable information in a timely manner prejudiced him because defense counsel did not have all the necessary information in time to prepare a reasonable defense. No claim of ineffectiveness of counsel is asserted. The motion court nonetheless ruled that the State provided defense counsel all the discovery required under Rule 25.03. The motion court noted that the amended motion refers to a single specific item, a computer log, that the State allegedly failed to disclose in a timely fashion. Ervin sought a Department of Revenue computer log in order to verify certain inquiries made with respect to Ervin's automobile license number. The log was provided to Ervin prior to trial. Furthermore, the information simply corroborated information in police reports, which were already in Ervin's possession. Hence, the motion court was not clearly erroneous in ruling that movant failed to demonstrate any prejudice from the delay.

### 6.

Next, Ervin alleges that the prosecutor's investigator, Richard Lee, tampered with evidence and threatened witnesses at trial. Ervin does not allege ineffective assistance of counsel but apparently relies on *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), as authority for the proposition that matters external to counsel's actions may support a claim of ineffective assistance.

■ According to the amended motion, Lee changed the tab on a photograph of Mrs. Hodges' bedroom and told a witness prior to trial that his name had been mentioned as a possible suspect. The motion court did not make a specific ruling on the tampering with evidence charge. However, the transcript reveals that the license number found recorded on a pad in the Hodgeses' home had been incorrectly tabbed on the photograph. The investigator, seeing the mistake, simply corrected the tab to reflect the evidence. This is not tampering.

■ With respect to the allegation that the investigator tampered with a witness, the motion court ruled that Ervin failed to carry the burden of proof on this issue. We agree. The amended motion briefly recites the allegation, giving only a cursory description of one conversation between defense witness Patrick Connell and the State's investigator, Richard Lee. Connell testified that the investigator advised him before he testified that his name was implicated in the murders. While such tactics cannot be condoned, reversal is not mandated where no prejudice is demonstrated. Connell testified at the hearing on Ervin's motion for new trial that the conversation with Lee did not affect his testimony. No other allegations of tampering are asserted. The point is denied.

### 7.

■ Ervin apparently contends that Rule 29.07(b)(4) is unconstitutional both facially and as applied. Ervin asserts that he is denied effective assistance of counsel because this rule "forced" him to proceed *pro se* at a critical stage and also put him at odds with his appointed counsel. Rule 29.07(b)(4) requires the trial court at the conclusion of final sentencing to advise the defendant of his right to proceed under Rule 24.035 or Rule 29.15. The rule also mandates that the trial court conduct a preliminary examination of the assistance of counsel received by the defendant in order to determine whether probable cause exists to believe that the defendant received ineffective assistance.

This argument is without substance. The conviction and sentencing are complete before the trial court begins its inquiry under Rule 29.07. Hence, the Sixth Amendment right to counsel is not implicated. The point is denied.

### 8.

Ervin's amended 29.15 motion claims that his trial counsel was ineffective for failing to request a separate hearing on Ervin's pre-trial motion to suppress evidence. Defense counsel had filed a motion to suppress on December 12, 1989, seeking to keep out certain evidence because of an alleged illegal search and seizure. Law enforcement officials seized cocaine, green stamps, personal notes, credit card receipts, newspaper clippings, telephone bills and other items from Ervin's residence pursuant to a search warrant. The hearing on the motion to suppress took place with the trial. The trial court overruled the motion to suppress.

The amended motion's bare claim asserts simply that trial counsel should have made "sure that the hearing was conducted and/or properly reported and included in the record on appeal." At the evidentiary hearing, trial counsel recalled that the idea to combine the hearing on the motion to suppress with the trial came either from the trial judge or the prosecutor, but that he agreed to it. Counsel also testified that he felt that the motion would be unsuccessful. In addition, counsel vehemently denied that he agreed to hear the motion to suppress with the trial in order to "speed things along."

The motion court did not rule specifically on this matter, but included this claim within the myriad of other allegations of ineffectiveness that Ervin failed to prove by a preponderance of the evidence. Here, the amended motion has failed to plead and motion counsel has failed to produce *any* evidence to indicate how counsel was specifically ineffective—whether these items were later objected to by counsel, whether a separate hearing had any chance of success, or whether a successful ruling would have resulted in a different outcome. Ervin's claim is pure speculation. The motion court did not clearly err in overruling this aspect of the motion. The point is denied.

### 9.

Appellant raises a myriad of claims asserting that defense counsel was generally ineffective for failing to object to numerous alleged instances of prosecutorial misconduct. The sum of these failures, it is alleged, resulted in an unfair trial. Ervin's meritorious claims have already been addressed. As to the remaining littany of claims, we find that the motion court did not clearly err in ruling that the movant had not met his burden of proving these allegations by a preponderance of the evidence.

### 10.

Ervin raises twelve additional assignments of motion court error in overruling his Rule 29.15 motion. These can be gathered under two general headings: (1) failure of trial counsel to preserve trial court error by failing to object to testimony or instructions, and (2) defense counsel's actions (a) in failing to submit the second degree murder instruction and (b) denigrating the seriousness of the proceedings by indicating he would do his part to "speed up the case."

As to the first category, each of the supposed trial court "errors" has been reviewed by this Court on the merits. Our plain error review is particularly broad and generous in death penalty cases. Most of the objections Ervin now claims his trial counsel failed to offer were barren of merit. Trial counsel is not ineffective in failing to advance non-meritorious objections. Moreover, none of the claims of trial error to which Ervin now points as proof of the ineffectiveness of his counsel has been decided in his favor. Having decided the substantive issue against Ervin, we will not re-examine it on a theory of ineffective assistance of counsel. *Amrine,* 785 S.W.2d at 531. These points are denied.

As to the second category, the record shows and Ervin does not dispute that he chose to forego any lesser included offense instruction adopting a "go for broke" strategy. Having chosen incorrectly, Ervin now insists that his trial attorney should not have permitted this choice. It is not ineffective assistance of counsel to follow a knowing and voluntary waiver of a

right by a defendant as part of trial strategy formulated in consultation with that defendant. The point is denied.

 Second, the motion court found that trial counsel's "speed up the case" language did not prejudice the defendant. The trial court concluded that such references were simply made as a figure of speech "and in the context of attempting to get the jury to focus on what would be happening next." This finding is not clearly erroneous. The point is denied.

### VIII.

The judgment of the trial court is affirmed in all respects.

HOLSTEIN and THOMAS, JJ., and RENDLEN and BLACKMAR, Senior Judges, concur.

COVINGTON and BENTON, JJ., not participating.

PRICE, J., not sitting because not a member of the Court when case was submitted.