**STATE of Missouri, Respondent,**

v.

**Rufus James ERVIN, Appellant.**

No. 79968.

Supreme Court of Missouri,
En Banc.

Nov. 3, 1998.

Rehearing Denied Dec. 1, 1998.

**152**

Janet M. Thompson, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cassandra K. Dolgin, Asst. Atty. Gen., Jefferson City, for respondent.

COVINGTON, Judge.

Appellant, Rufus James Ervin, was convicted of the Class A felony of murder in the first degree, in violation of section 565.020, RSMo 1994, for which he was sentenced to death. Appellant appeals his first degree murder conviction and his sentence. Affirmed.

The evidence is viewed in the light most favorable to the verdict. *State v. Kreutzer*, 928 S.W.2d 854, 859 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). On August 31, 1994, appellant telephoned Lucius House, a resident of St. Louis. Appellant told House that he had received a telephone call asking him to come to work in Arnold, Missouri, and to bring additional help. House agreed to go. Appellant drove to House's residence to transport House to the job. Keith McCallister and Henry Cook accompanied appellant and House. The men stopped to purchase alcohol on their way to the Semco Factory, where they arrived at about midnight. At 1:00 a.m. on September 1, 1994, the four men left the factory. Appellant drove to a liquor store where he purchased more alcohol for himself and the other men. He said that he was going to Leland White's property, where appellant had also lived for a period of time.

Upon arriving at White's property, appellant honked the horn. McCallister exited the automobile and opened the gate. After parking the car, appellant got out and walked over to Leland White, who was standing outside of his trailer. Appellant and White shook hands. They went inside the trailer. About fifteen minutes later, House heard appellant yelling, "This is mine. This is mine." White called for help. Something hit against the trailer wall, a lamp was knocked over, and the trailer caught fire.

Appellant dragged White out of the trailer after it caught fire, pulling him by something tied around White's neck. White was naked. Appellant dragged White across the driveway and propped him up against a tree. White then said to appellant, "Just go ahead

and kill me, James. Just kill me, James." Appellant picked up a brick with which he hit White four or five times on the head. Appellant began to walk away from White but returned to him after White moved. Appellant then hit White three or four additional times in the head with the brick. Appellant returned to the car and said to the others, "The motherfucker said kill me, so I did."

The four men returned to the car. Appellant attempted to drive away, but backed the vehicle onto a boulder. After examining the car and trying to free it, appellant went to White, picked him up, and took him over to the car. Appellant threw White over the hood. Appellant then told McCallister to "come on, help me throw this motherfucker in the fire." McCallister helped appellant. They threw White about three feet into the fire. Appellant and McCallister returned to the car and again tried to free the vehicle from the boulder. About an hour later, they were able to remove the vehicle from the boulder.

The automobile was not operable. Appellant decided that he should call the highway patrol and report that the house blew up. The men pushed the car back up in the driveway. Appellant and McCallister tried to throw White further into the fire. Appellant and the others then wiped White's blood from the hood of the vehicle with newspaper.

Appellant flagged a motorist and obtained a ride to the home of Don Cook, who lived eight-tenths of a mile from White. Cook was acquainted with both White and appellant. Appellant told Cook that White was dead and appellant wanted to call the sheriff. Appellant said, "We've had an explosion . . . ." and told Cook that White had said, "James, don't let me burn. Don't let me burn."

Cook could not reach the sheriff so he called Deputy Umphleet, who lived nearby. Umphleet went to White's trailer, as did Cook and appellant. Umphleet observed a white male lying face down on a burned-out portion of the building. Nothing was left of the residence. Appellant told Umphleet that there had been an explosion and fire and that the explosion had blown the stove from one side of the residence to the other. Umphleet noticed, however, that the stove remained

connected to a propane tank. Additional law enforcement personnel arrived at the scene. Deputy Sheriff John Farrar assisted Umphleet. Approximately ten to twelve feet south of White's body, Farrar collected a brick stained with what appeared to be blood.

Jefferey McSpadden, the Reynolds County coroner, arrived. He determined that the cause of death was an open skull fracture. After speaking with McSpadden, Umphleet arrested appellant, Cook, House, and McCallister.

Sergeant Kirby Johnson of the Missouri Highway Patrol interviewed appellant on September 1, 1994. He read appellant his rights at 4:13 p.m. Between 4:18 p.m. and 4:36 p.m., Johnson taped a conversation with appellant. Appellant denied cutting White's throat, denied hitting him with a brick, and denied throwing his body into the fire. Johnson asked appellant about the discrepancies between appellant's statements and the statements of the three other men, who remained in custody. Johnson then left the room after which two other officers interrogated appellant. Finally, after a break in the proceedings, appellant yelled that he had hit White in the head with a brick.

Leland White died as a result of blunt trauma to his head. He sustained at least five separate blows to the head. White suffered, in addition, nine incised wounds that cut across his neck. Most penetrated only through the skin and dermis. Two incisions exposed the muscles of the neck. One cut through White's trachea. There were superficial incisions over White's left shoulder and lower right side of his neck. There were seven or eight superficial incisions partially through the skin across the front of White's thigh. The jury found appellant guilty of murder in the first degree.

In the penalty phase of trial, the state presented evidence of appellant's prior convictions for assault upon a law enforcement officer and two weapons counts. The state also adduced testimony regarding appellant's arrest for driving while intoxicated. Appellant engaged in verbally abusive and physically violent conduct following the arrest. The state also adduced testimony from a

former Phelps County jailer pertaining to appellant's assault upon him, which resulted in the jailer sustaining a broken right jaw joint and a bruised brain with swelling. Appellant presented evidence from two clinical psychologists.

At the close of the evidence, instructions, and arguments by counsel in the penalty phase, the jury was unable to reach a verdict on punishment. The trial court, as a consequence, sentenced appellant, as provided under section 565.030.4(4). The court imposed a sentence of death.

## I.

In his first point on appeal, appellant alleges that the trial court violated his rights to due process, an impartial jury under the Sixth Amendment, and freedom from cruel and unusual punishment when the court struck venireperson Melick for cause. The trial court struck Ross Andrew Melick based on his responses to voir dire questions regarding his ability to consider the death penalty.

When the prosecutor asked Melick whether he could envision himself voting for the death penalty, Melick replied that the only case in which he would be able to vote for the death penalty would be one where genocide was involved:

MR. BROWN: You're reserving that for just the absolute rarest and most horrible cases, is that correct?

JUROR MELICK: Yes. And I would probably have to really struggle with that, too.

MR. BROWN: But in most cases you do have a moral belief against the death penalty, is that correct?

JUROR MELICK: Yes.

MR. BROWN: All right. Now because of your view on the death penalty, that would probably keep you from being fair and impartial if this case wasn't one of those horrible cases, wouldn't it?

JUROR MELICK: In respect to the sentence, yes. Not up to the decision of guilt or innocence on the other thing.

MR. BROWN: But on the issue of what punishment you'd be willing to vote for and

return as a verdict, it would impair your ability to –

JUROR MELICK: It might not be in terms of the law, yes.

MR. BROWN: All right. And you might not be able to follow the judge's instructions at that point, is that correct?

JUROR MELICK: It might be very difficult.

MR. BROWN: So difficult it might impair your ability to do it.

JUROR MELICK: It could, yes.

MR. BROWN: Now you might be selected as the foreperson of the jury, if you were to serve. Would you be able – you might have trouble signing a death verdict, wouldn't you?

JUROR MELICK: I think I probably would.

Appellant's counsel later inquired of Melick:

MR. HADICAN: All right. Mr. Melick, I think you indicated that you would have some problems, did you not?

JUROR MELICK: Yes.

MR. HADICAN: But you did say that you would be able to listen to the evidence.

JUROR MELICK: I think so, yes.

MR. HADICAN: And did you say you would apply his honor's instructions to this case.

JUROR MELICK: Yes.

MR. HADICAN: All right. And if those instructions included a directive from the Court to the effect that you consider life or death, you would comply with that instruction, wouldn't you, and consider it?

JUROR MELICK: Yes.

MR. HADICAN: All right. And did I understand you to say that notwithstanding the fact that it would be difficult for you to do that, you would do it?

JUROR MELICK: I would do it. I don't know if I would be able to, in a case such as I envision this to be, if I would be able to do it in this case.

MR. HADICAN: But you don't know anything about this case.

JUROR MELICK: That's correct.

MR. HADICAN: So you're not saying, as we sit here at this juncture, that you would automatically ignore his honor's instruction, if he gives that instruction to the effect that life and/or death be considered.

JUROR MELICK: That's correct.

■ Under the Sixth Amendment right to an impartial jury, a trial court cannot strike venirepersons simply because they voice general objections to the death penalty. *Gray v. Mississippi*, 481 U.S. 648, 657, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). The trial court may, however, exclude potential jurors if they are "irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances" of the individual case. *Id.* at 657–58, 107 S.Ct. 2045. There is no requirement that it must appear with "unmistakable clarity" that a venireperson will automatically vote against the death penalty. *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). The standard for determining whether a venireperson should be removed from the jury pool is whether his views on the death penalty, taken from voir dire as a whole, would prevent or substantially impair the performance of his duties as a juror under the instructions and the oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The trial court may excuse venirepersons if their views on the death penalty would keep them from following the court's instructions regarding the death penalty. *Kreutzer*, 928 S.W.2d at 866.

■ The trial court is in the best position to evaluate a potential juror's ability to follow the law and has broad discretion when determining a juror's qualifications. *Id.* The trial court's ruling should not be disturbed on appeal unless its ruling is clearly against the evidence and is a clear abuse of discretion. *Id.* The determination of a venireperson's qualifications should not be based upon a single answer but upon the totality of the person's responses to questioning from both the prosecutor and the defense attorney. *Id.* Even if venirepersons believe that the death penalty is unjust, they may still serve as jurors if they state their willingness to set aside temporarily their beliefs for the dura-

tion of the case. *Gray*, 481 U.S. at 658, 107 S.Ct. 2045.

■ Appellant argues that excluding Melick from the jury panel deprived him of his right to a fair trial with a panel of impartial jurors. Appellant further alleges that a single strike based on a venireperson's religious or moral beliefs regarding the death penalty violates his Sixth Amendment rights. *Davis v. Georgia*, 429 U.S. 122, 122–23, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). He claims that the trial court's decision violated his Sixth Amendment rights because Melick indicated that he could fairly serve as a juror. Appellant also argues that Melick should not have been excluded because he stated that he would be able to be fair and impartial on the issue of guilt. Finally, appellant claims that Melick's responses merely reflect his understanding of the law.

Melick's responses do not form a basis to disturb the trial court's ruling. Although they may be read to be equivocal, they are nothing more. Melick's responses to both the prosecutor's and the defense attorney's voir dire questions indicate that Melick has a moral opposition to the death penalty in most cases; he claimed he would apply the penalty in only rare cases, such as genocide and would have difficulty applying it even in those cases. He stated that his beliefs about the death penalty would keep him from being fair and impartial regarding sentencing in a case that was not similar to genocide. He noted, however, that his beliefs would not impair his decision on guilt. In response to defense counsel's questioning, furthermore, Melick said he would apply the trial judge's instructions and would comply with an instruction "that you consider life or death." Although the preceding response supports appellant's argument, it does not constitute a basis for sustaining · appellant's argument. The trial court does not abuse its discretion if it gives more weight to one response than to others. *State v. Roberts*, 948 S.W.2d 577, 597 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998). Based upon the totality of Melick's statements and the trial court's ability to evaluate Melick's commitment to follow the law, the trial court could reasonably have concluded

that Melick's views could "substantially impair" his ability to follow the law and perform the duties required of a juror. The trial court was well within its discretion when it excluded Melick for cause.

## II.

Appellant contends that the trial court erred in admitting into evidence certain references to out-of-court statements made by appellant's companions, presented to the jury through the prosecutor's opening statement and closing argument, and through testimony of various witnesses, and in failing to grant a mistrial *sua sponte*. Appellant claims deprivation of his rights to due process, to confront and cross-examine witnesses against him, to a fair trial, and to freedom from cruel and unusual punishment. Review is for plain error.

In its opening statement in the guilt phase, the state described what occurred on the night appellant murdered Leland White. The prosecutor stated that appellant, Lucius House, Keith McCallister, and Henry Cook, after buying some alcohol, went to the Semco factory. After about an hour, they decided to leave. The prosecutor stated that the four men got into appellant's automobile, obtained more alcohol, and headed south toward White's house. When they got to the farm where White lived, all four men got out of the car. Appellant entered the trailer where White lived. The prosecutor stated that shortly after appellant entered the trailer, the three men outside could hear what sounded like a beating inside the trailer. They could hear appellant screaming, "It's mine, it's mine." The prosecutor stated that the men could hear Leland White screaming, "Help me." The three men then saw a flicker and they noticed that the trailer had caught fire. They saw defendant dragging White from the trailer with something wrapped around his throat. The prosecutor stated that appellant later made a statement in which he incriminated himself in White's death but denied cutting White's throat.

Of the three individuals who accompanied appellant on the night of the murder, only Lucius House testified. He testified that he had seen appellant in the trailer with White and that he heard appellant say, "This is mine. This is mine." He testified that he heard White call for help. He stated that he heard a bump, saw a lamp knocked over and the trailer catch fire. He saw appellant drag White out of the fire, across the driveway and prop White against a tree. House stated that he heard White tell appellant to kill him and he saw appellant pick up a brick and hit White in the head with it. He testified that they damaged appellant's vehicle. They all got out to see what was wrong and to try to get the vehicle off the boulder. They intended to return to St. Louis. House testified that appellant and McCallister picked White up and slung him into the fire. They pushed the car onto what they thought was level ground. He testified that appellant said he ought to go call the highway patrol and tell them that the house "blowed up." House testified that they tried to talk him out of calling the police.

A field investigator for the highway patrol, Kirby Johnson, also testified. Sergeant Johnson assisted the fire marshal in the investigation of the murder. He interrogated appellant. He testified that during the original interrogation, appellant had denied cutting White's throat, denied hitting White with a brick, and denied throwing White into the fire. The prosecutor asked Johnson what happened after he had finished tape recording appellant's statement. Johnson responded that he confronted appellant with some of the information that the other three individuals had told the investigators, specifically about discrepancies concerning appellant's involvement. He stated that they took a small break in the questioning and that appellant "just continued to deny involvement in Mr. White's death."

On cross-examination, Johnson testified with respect to circumstances in which House and Cook were permitted to talk with one another prior to giving a taped statement. Johnson testified that he recalled that House told Cook that they had to tell the truth; that they were going to be in a lot of trouble because of what appellant had done. On cross-examination Johnson also stated that House and Cook were released after they

had given their statements but that McCallister was detained.

Sergeant Watson also testified in the guilt phase. He stated that he had interviewed House at 11:00 a.m. the morning after the murder and that House had described to him what had occurred. He testified that House requested and was allowed to confer with Cook. After House and Cook conferred, Sergeant Watson stated, House agreed to make a taped statement, which was essentially the same as his original statement.

■ Appellant argues that the state in its opening statement, closing argument, and through testimony of witnesses, made its case in substantial part upon the testimony of Lucius House. He contends that the references by Sergeants Johnson and Watson to statements of Cook and McCallister served to bolster the credibility of Lucius House and point out discrepancies from the version of events offered by appellant. Since the discrepancies concern whether appellant was involved in the killing of White, appellant claims, the reference by Johnson clearly indicated that appellant's non-testifying companions had told Johnson that appellant was in fact involved in the offense. Appellant makes brief reference to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), but relies essentially upon *State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993). In *Debler*, this Court found that admitting a co-defendant's statement that "we" had set up the gun was error, although not prejudicial error. *Id.* at 648–49.

Appellant's contention does not constitute plain error and is without merit. While the state did rely upon the testimony of Lucius House and emphasized his testimony in opening statement and closing argument, the prosecutor did not rely upon the testimony of McCallister or Cook. The prosecutor's reference to the four persons in opening statement was permissible as describing what the evidence would show. As for Sergeant Johnson's reference to the "discrepancies," first, any inferences the jury might draw from Sergeant Johnson's testimony would be nothing but inferences. Johnson provided no indication of the nature of the information provided by House, McCallister, or Cook, other

than it was not consistent with appellant's statements. Whether the discrepancies themselves went to the essential issues relative to appellant's guilt are left only to speculation. Furthermore, to infer that Sergeant Johnson's reference to McCallister and Cook in the midst of his recitation of the events subsequent to appellant's arrest impermissibly bolstered the testimony of Lucius House in any way, let alone in a way that constituted manifest injustice, is simply not possible. Appellant does not show that the nature of the information provided by McCallister or Cook through Sergeant Johnson's testimony is either specific or material. The same applies to the testimony of Sergeant Watson. Appellant's speculation and effort to elevate the references by Sergeants Johnson and Watson is insufficient to convict the trial court of plain error.

### III.

Appellant alleges that the trial court erred in admitting evidence of non-statutory aggravating circumstances submitted by the state during penalty phase. Appellant further claims that the trial court erred in submitting Instructions 17 and 18, which instructed the jury that it could consider all evidence presented in both the guilt and penalty phases of the trial to determine whether non-statutory aggravating circumstances exist. Appellant argues that the jury should have been instructed regarding how to consider the state's evidence of non-statutory aggravating circumstances.

During the penalty phase, Gary Miller testified about an incident in which he arrested appellant for driving while intoxicated in 1993. Miller stated that he took the appellant to a hospital where appellant became verbally abusive to the triage nurse. According to Miller's testimony, appellant also became physically violent, kicking, spitting, and attempting to bite the nurse and Miller.

David Schoengert testified about an incident in 1996. He was working in the Phelps County jail while appellant was incarcerated in that facility. Appellant threatened to kill his cellmate if officers did not remove the cellmate. When Schoengert attempted to re-

move the cellmate, Schoengert was involved in an altercation with appellant. Appellant struck Schoengert multiple times in the face and jaw and beat Schoengert's head against the metal bars of the cell. As a result of the attack, Schoengert suffered a broken jaw joint and bruising and swelling in his brain.

■ It is well established that the purpose of having a separate penalty phase in a capital trial is to permit the presentation of a broad range of evidence that is relevant to punishment but irrelevant or inflammatory as to guilt. *Gregg v. Georgia,* 428 U.S. 153, 190–92, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). During the penalty phase, both the state and the defense may introduce any evidence pertaining to the defendant's character. *State v. Six,* 805 S.W.2d 159, 166 (Mo. banc), *cert. denied,* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). "Because of the importance of the death penalty decision, the sentencer is entitled to any evidence that assists that decision." *State v. Chambers,* 891 S.W.2d 93, 107 (Mo. banc 1994).

■ Appellant asserts nevertheless that under *Debler,* 856 S.W.2d 641, unconvicted misconduct is irrelevant and inadmissible to prove non-statutory aggravating circumstances without an instruction to the jury that they must find beyond a reasonable doubt that the misconduct occurred. *See id.* at 657. Appellant's reliance on *Debler* is mistaken. This Court clarified the holding of *Debler* in a line of cases beginning with *Chambers,* 891 S.W.2d 93. In *Chambers,* this Court re-interpreted the *Debler* decision regarding evidence of unconvicted misconduct used to prove non-statutory aggravating circumstances. *Id.* at 106. This Court stated that evidence of unconvicted misconduct is inadmissible where the state does not provide the defendant with notice that it intends to introduce the evidence. *Id.* at 107. Since the decision in *Chambers,* this Court has consistently held that the error in *Debler* was lack of notice. *State v. Kreutzer,* 928 S.W.2d 854, 874 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). Appellant does not allege that he had no notice of the state's intent to submit evidence of unconvicted misconduct to prove non-statutory aggravating circumstances.

*Debler,* therefore, does not apply to the instant case. The trial court did not err when it overruled appellant's objection to Miller and Schoengert's testimony.

Appellant also argues that the trial court should have instructed the jury regarding how to consider evidence supporting non-statutory aggravating circumstances. Again relying on *Debler,* he claims that without such an instruction, the jury would not know what it should consider to be aggravating and could apply the incorrect burden of proof.

■ After Miller and Schoengert testified, the court read Instructions 17 and 18 to the jury. Instruction 17 states in relevant part:

> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 16 exists, then you must decide whether there are facts and circumstances in aggravation of punishment, which taken as a whole, warrant the imposition of a sentence of death upon the defendant.
>
> In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial. . . .

Instruction 18 contains similar language. As appellant notes, the jury was not instructed on how to apply the testimony of Miller and Schoengert to determine whether non-statutory aggravating factors existed.

■ Appellant's argument is without merit. First, as discussed above, appellant mistakenly relies on *Debler.* Furthermore, Instructions 17 and 18 are patterned after MAI–CR3d 313.41A and 313.44A. They are, therefore, presumptively valid under Supreme Court Rule 28.02(c). "Whenever there is an MAI–CR instruction applicable under the law . . ., the MAI–CR instruction is to be given to the exclusion of any other instruction." *State v. Ervin,* 835 S.W.2d 905, 922–23 (Mo. banc 1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

Finally, the language of Instructions 17 and 18 is consistent with section 565.032.1(2), RSMo Supp.1998. The statute plainly provides that a jury in the penalty phase of a capital case "shall not be instructed upon any specific evidence which may be in aggravation or mitigation of punishment, but shall be instructed that each juror shall consider any evidence which he considers to be aggravating or mitigating." Section 565.032.1(2).[1]

The trial court did not err.

## IV.

Appellant argues that the trial court erred in overruling his motions for judgment of acquittal at the close of the state's case, at the close of all evidence, and in his motion for new trial because there was insufficient evidence to prove deliberation beyond a reasonable doubt. He also contends that the alcohol he consumed, in combination with organic brain impairment, precluded his ability to deliberate. Appellant claims that the trial court's actions deprived him of state and federal rights to due process, a fair trial, and freedom from cruel and unusual punishment.

 In determining the sufficiency of the evidence on appeal, the evidence and all inferences drawn from the evidence are viewed in the light most favorable to the verdict. *State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1171, 140 L.Ed.2d 181 (1998). This Court will disregard evidence and inferences contrary to the verdict. *Id.* The purpose of appellate review is not to weigh the evidence but to determine whether there was sufficient evidence from which a reasonable juror could have found appellant guilty as charged. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991).

 Deliberation is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3), RSMo Supp. 1998. Deliberation does not require proof that the defendant contemplated his actions for a long period of time. *Feltrop*, 803 S.W.2d at 11. Deliberation may be implied from the circumstances surrounding the incident. *Johnston*, 957 S.W.2d at 747. Deliberation may be inferred where the "killer had ample opportunity to terminate the attack once it began." *Id.* Evidence of a prolonged struggle, multiple wounds, or repeated blows may also support an inference of deliberation. *Id.* at 748.

 Appellant's first argument, that the trial court erred when it did not grant his motion for judgment of acquittal at the close of the state's case, is without merit. When appellant presented evidence in his own defense after the state rested, he waived any claim of error relating to the denial of his motion. *State v. Purlee*, 839 S.W.2d 584, 587 (Mo. banc 1992).

 Appellant's contention that the evidence was not sufficient to prove deliberation is also without merit. He engaged in repeated attacks on White. Lucius House testified that he heard appellant and Leland White arguing. House saw the trailer catch fire. Appellant dragged White from the burning trailer with something tied around White's neck. Appellant propped White up against a tree. White said, "Just go ahead and kill me, James. Just kill me, James." Appellant picked up a brick and hit White in the head four or five times. Appellant then walked away. White moved his hand. Appellant went back to White and hit him three or four additional times. After attempting to move his car, appellant and McAllister threw White's body into the fire.

Dr. Michael Zarracore, the pathologist, testified that White died as a result of blunt trauma to his head. Dr. Zarracore stated that he could document at least five separate blows to the head. He further testified that White suffered nine incised wounds that cut across his neck. Most of the wounds penetrated only through the skin and dermis. Two incisions exposed the muscles of the neck. One cut through White's trachea. Dr. Zarracore further testified that there were superficial incisions over White's left shoul-

---

1. Appellant's claim that section 565.032.1(2) is unconstitutional is apparently an afterthought. The claim is not preserved for appellate review.

der and lower right side of his neck. There were also seven or eight superficial incisions partially through the skin across the front of White's thigh. In sum, appellant inflicted numerous injuries upon White, and the attack was prolonged. There is sufficient evidence from which a reasonable juror could infer that appellant acted with deliberation.

Appellant asserts that his organic brain impairment, which causes responses out of proportion to the stimuli and emotional and impulsive responses, combined with his consumption of alcohol, precluded his ability to deliberate. Appellant is mistaken. There is absolutely no evidence to support appellant's claim. It is purely speculative.

Viewing the evidence in the light most favorable to the verdict, a reasonable juror could find the defendant guilty of first-degree murder.

## V.

Appellant contends that the statement he made to the police in which he admitted involvement in White's murder was improperly received into evidence because his statement was made involuntarily and unintelligently, while he "was subject to coercion by the police officers who were interrogating him and while he had not slept in over twenty-four hours and was under the influence of alcohol and his prescription medication."

Appellant weaves a tapestry that includes intoxication, fatigue, ingestion of prescription medications, brain impairment, and racial threats. Appellant points out that he also suffers from a condition called "cognitive disorder NOS," has visual memory problems, spacial organizational reasoning problems, problems with his fine tactile sensitivity and memory, and has very slow psychomotor speed. He sustained closed head injuries during his lifetime. Appellant states that he was taken from the scene to the sheriff's office between 8:00 and 9:00 a.m. on September 1, 1994, was handcuffed to a desk and was not allowed to clean up or to see a clock. He stated that, during interrogation, he was told by the officers that they recalled the day when four "niggers" would never have even made it to the courthouse in Reynolds County. He stated that the officers threatened him and his friends with a lynch mob. Finally he asked Sergeant Watson what Watson wanted him to say. Appellant also states that by the time he gave the tape-recorded statements to the officers, he had not slept in at least twenty-four and, possibly, thirty-six hours.

When a defendant challenges the admissibility of a statement or confession on the ground that it was involuntary, the state bears the burden of showing voluntariness by a preponderance of the evidence. *Feltrop*, 803 S.W.2d at 12. The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). In addition to reviewing whether the defendant was advised of his rights and understood them, the court reviews the totality of the circumstances, including but not limited to the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of food, water, or other physical needs. *Id.* Evidence of the defendant's physical or emotional condition alone, absent evidence of police coercion, is insufficient to demonstrate that the confession was involuntary. *Id.*

The record reflects that the state met its burden of showing that appellant's statements were voluntary and intelligent. Viewed in the light most favorable to the trial court's ruling refusing to suppress the statements, the facts surrounding appellant's statements, as the facts relate to the test set forth above, are as follows: Appellant was informed of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and he waived those rights. Although appellant purchased significant amounts of alcohol in the very early morning of September 1, 1994, and claims that he was "impaired by alcohol," appellant told Sergeant Johnson that he was sober.

Although appellant claims to suffer from a seizure disorder for which he had been prescribed medication, nothing in the record supports appellant's inference that the medication, assuming appellant took it, had any effect whatsoever on him at times relevant to this case. There is no evidence that he took any medication that day, in fact. Mere reference to a seizure disorder and mental disorder diagnoses is not sufficient. *See State v. Schnick,* 819 S.W.2d 330, 337 (Mo. banc 1991) (evidence that defendant suffered from organic personality disorder was not sufficient to render confession involuntary in the absence of evidence of official coercion). There is no evidence that appellant's alleged lack of sleep in any way affected his ability to understand and voluntarily waive his rights. The two taped interviews of appellant lasted twenty-three minutes and eighteen minutes, respectively. Finally, Lucius House testified that he did not feel threatened at any time during his interview. Deferring, as a matter of law, to the trial court's superior opportunity to determine the credibility of witnesses, House's testimony refutes appellant's self-serving accusations that he was threatened with mob violence.

Based upon the totality of circumstances, the trial court did not err in finding that appellant voluntarily and intelligently confessed to the murder of Leland White.

## VI.

Appellant next contends that the trial court committed reversible error in admitting into evidence state's Exhibits 51, 52, 58, 60, 61, 62, 63, and 64, all of which are photographs. Appellant contends that the color, size and repetitive nature of the photographs prejudiced the jury against appellant, as to both guilt and punishment. Once again, review is for plain error.

The trial court is vested with broad discretion in the admission of photographs. *State v. McMillin,* 783 S.W.2d 82, 101 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Photographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds or injuries, the cause of death, or otherwise assist the jury in understanding the testimony or help in proving an element of the crime. *State v. Brooks,* 960 S.W.2d 479, 501 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998). It is generally accepted that if photographs are gruesome, it is simply because the crime itself was gruesome. *State v. Murray,* 744 S.W.2d 762, 772 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988).

The court viewed the photographs at least twice. The court excluded Exhibit No. 59, which he found to be repetitious. As for the remaining photographs, Exhibits 51 and 52 fairly and accurately depicted the body of Leland White as viewed the morning of September 1, 1994. Exhibits 58 and 60 through 64, autopsy photographs, depicted neck wounds, head injuries, and burns on White's back. Depicting the nature and location of wounds and elucidating upon and corroborating the testimony of Lucius House were sufficient bases for the trial court to have admitted the photographs. In addition, since appellant denied that the murder of Leland White was committed with deliberation, the photographs were properly admitted to aid the state in establishing the element of deliberation. *Brooks,* 960 S.W.2d at 501; *State v. Storey,* 901 S.W.2d 886, 895 (Mo. banc 1995).

The trial court did not commit plain error.

## VII.

Appellant next claims plain error with respect to various inquiries, statements, and arguments made during *voir dire,* guilt and penalty phases of trial, none of which is preserved for appellate review. He claims that the trial court should have, *sua sponte,* disallowed the inquiries, statements and arguments and should have granted, *sua sponte,* a mistrial.

The point relied on is as follows:

The trial court plainly erred in allowing the state to argue and in not declaring a mistrial when the state argued:

### A. Voir Dire

1. That the evidence here "as in most murder cases" will be gruesome and you are not supposed to like it;

2. That an aggravating circumstance is something that makes this particular murder worse than others;

3. That the death penalty process is like a hallway with three doors;

4. That an aggravating circumstance could be when someone shoots a law enforcement officer;

5. That since they had made it this far, there was a chance that they would deliberate on the death penalty issue.

### B. Guilt Phase Opening

1. That James was the sole beneficiary of Lee White's will and wrote a letter in January, 1995 asking for control of Lee White's bank account.

### C. Guilt Phase Closing

1. That Lee White could "possibly even drown in his own blood perhaps, laying [sic]there;"

2. That the jury should imagine how painful it was to have "your" throat cut;

3. That Dr. Zaricor says the leg wounds are "consistent with someone who is restrained at the time of the wounds;"

4. That the manner of death "is victimization;"

5. That Lee White had no jury, no lawyer, no judge.

### D. Penalty Phase Opening

1. That the jury should apply the hallway analogy from voir dire to their deliberative process;

2. That the jury should consider evidence surrounding James's prior conviction for DWI and an alleged assault on an officer in the Phelps County Jail;

3. That it would call a nurse to testify about James's actions after his DWI arrest.

### E. Penalty Phase Closing

1. That the jury should consider how many law enforcement officers James has assaulted and what the damages to those people have been;

2. That the jury, "collectively, the 12 of you, [must] determine whether or not to give the death penalty or to give life in prison without parole;"

3. That the State "strongly suggests to you that this is a case which deserves the death penalty;"

4. That the instructions require that the jury decide if aggravating circumstances exist and if they find that the death penalty is the appropriate punishment, they just need to write out the statutory aggravating circumstances that they have found;

5. That trial counsel came to tears in his argument and the state wondered why James did not and why his attorney had to do it for him;

6. That trial counsel was trying to put the jurors in the shoes of the victim and because that was "offensive" these arguments denied James due process, a fundamentally fair trial and freedom from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10, 18(a) and 21 of the Missouri Constitution in that the arguments misstate the evidence and the law; were irrelevant and prejudicial; improperly personalized to the jury; improperly inserted the prosecutors' personal opinions; were speculative; referred to facts not in evidence, and referred to prior misconduct and bad acts which were not the subject of an instruction, all of which prejudiced James throughout the trial.

Even under the most liberal reading of Rule 30.06(d), the point relied on is insufficient for appellate review. But for the last of the twenty challenged inquiries, statements, and arguments, the point fails to state wherein and why the trial court erred. Appellate counsel seems to acknowledge this and invites this Court to find that she has

rendered ineffective assistance on appeal in the event that this Court finds, as it has, that the point relied on is defective.

In spite of the deficiency of the point relied on and in spite of the fact that none of the alleged errors was preserved for appellate review, this Court has reviewed the record and finds no manifest injustice or miscarriage of justice, even assuming, *arguendo*, that the statements were improper. This Court has no discretion, therefore, to grant plain error relief. *See* Rule 30.20. As for appellate counsel's invitation to find that she has rendered ineffective assistance on appeal, this Court's finding of no manifest injustice after review of the record renders counsel's invitation moot.

### VIII.

Appellant asserts that the trial court erred in admitting into evidence certain testimony of Deputy Farrar, Jefferey McSpadden, Mike Johnson, Dr. Zaricor, Gary Miller, and David Schoengert, for the reason that their testimony in various respects constituted improper expert opinion evidence, hearsay, or evidence of other crimes. Appellant also contends that the trial court erred in failing to grant a mistrial *sua sponte*. Appellant again requests plain error review because none of appellant's claims was preserved for appeal.

■ Sheriff's Deputy Farrar testified that the cuts to White's neck were "quite significant wounds." Appellant contends that since Farrar had no medical training or any expertise in the medical field or any special ability of observation that would have made him any more capable than the jury to observe the extent of the injuries that White sustained, his testimony should not have been allowed. Appellant lodges a similar contention with respect to the testimony of Jeff McSpadden, a coroner, who testified that the wounds "looked very severe to me." Error in admitting this evidence, if any, was not prejudicial because similar evidence was admitted elsewhere in the case by the pathologist, Dr. Zaricor. *State v. Mahurin*, 799 S.W.2d 840, 846 (Mo. banc 1990), *cert. denied*, 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62

(1991); *State v. Brown*, 949 S.W.2d 639, 642 (Mo.App.1997).

■ Mike Johnson, the fire investigator, testified without objection that he was first told that a bomb had gone off at the scene and was later told that there had been no bomb. Appellant contends that this testimony was damaging because its purpose was to engender in the jury a fear of uncontrolled violence. There is absolutely no basis to appellant's assertion. Johnson, a fire investigator, was simply recounting that he was dispatched to do an investigation relative to the fire in this case and that he was first told that a bomb went off at a house in Reynolds County. He went on to state that he went to the sheriff's office where he discussed the situation with Sergeant Johnson, who told him that there was not a bomb, rather, there was an explosion. Mike Johnson proceeded then to describe what happened when he arrived at the scene. Mike Johnson's testimony is nothing more than an explanation of his conduct; it is not inadmissible hearsay. *Murray*, 744 S.W.2d at 773.

■ Dr. Zaracor, the pathologist, described the wounds he found on White, including some superficial wounds on White's left shoulder, lower right neck, and right anterior thigh. He stated that, in sexual assault cases, he would expect to see wounds on the feet, legs, and thighs, as defensive wounds. He noted that the wounds that he found were unusual, however, since they were all localized on the front of the thigh and he found no defensive wounds on White's arms or hands. Appellant asserts that the "clear implication" that the state wished the jury to draw from Dr. Zaracor's testimony was that White had been killed during or after a sexual assault. Appellant's speculative assertion is without basis in the record. The state mentioned the superficial wounds only in connection with its argument that the wounds had been made coolly and deliberately "in some fashion of taunting...." The argument is without merit.

During the penalty phase of trial, the state presented evidence through Gary Miller that in May of 1993 appellant was arrested for driving while intoxicated, after which he was transported to a hospital where he became

verbally abusive and physically violent. The state also presented evidence through David Schoengert during the penalty phase that in January of 1996, while in custody in the Phelps County jail, appellant became physically violent and attacked a jailer. Appellant contends that the state should not have been allowed to adduce this evidence in the penalty phase without instructing the jury on how to assess non-statutory aggravating circumstances, citing *State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993). In *State v. Chambers*, 891 S.W.2d 93, 107 (Mo. banc 1994), this Court made clear that the error in *Debler* was lack of notice. Appellant makes no such claim in this case. Furthermore, as is well established, the sentencer is entitled to any evidence that assists its decision in the penalty phase. *Id.* at 107.

There is no error, plain or otherwise, with respect to any of appellant's assertions and no basis upon which the trial court should have ordered a mistrial *sua sponte*.

### IX.

■ Appellant contends that Instructions No. 4 and 13, defining proof "beyond a reasonable doubt" misled the jury about the burden of proof and allowed the jury to reach its decisions in both guilt and penalty phases based upon a level of proof less than that which is constitutionally mandated. Instruction No. 4 is patterned after MAI–CR3d 302.04. Instruction No. 13 is patterned after MAI–CR3d 313.30A. Appellant alleges that the language condemned in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because it allowed conviction upon proof less than a reasonable doubt, is similar to the language defining reasonable doubt in Instructions No. 4 and 13. Without specifying precisely what language offends, appellant simply states that the "language of the instruction" equates proof beyond a reasonable doubt with the lesser civil standard of "clear and convincing" evidence, thus reducing the state's burden of proof in both stages of trial.

This Court has repeatedly upheld the validity of jury instructions patterned after MAI–CR3d 302.04 and MAI–CR3d 313.30. *See State v. Griffin*, 848 S.W.2d 464, 469 (Mo.

banc 1993); *State v. Ervin*, 835 S.W.2d 905, 924 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Challenges to the validity of the instructions in other cases brought here have been with respect to the language that directs the jury to find a defendant guilty if, after consideration of all the evidence, the juror is "firmly convinced" that the defendant is guilty of the crime charged. This specific language has been repeatedly upheld. *See Griffin*, 848 S.W.2d at 469; *State v. Ervin*, 835 S.W.2d at 924; *State v. Blankenship*, 830 S.W.2d 1, 13 (Mo. banc 1992); *State v. Twenter*, 818 S.W.2d 628, 634 (Mo. banc 1991). Point denied.

### X.

Under section 565.035.3, RSMo 1994, this Court is required to review the sentence of death.

### A.

This court has performed its responsibility pursuant to section 565.035.3(1) and determines that there is no evidence in the record to suggest that the punishment imposed by the trial court was imposed under the influence of passion, prejudice or any other arbitrary factor.

### B.

This Court must also determine "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance . . . ." Section 565.035.3(2). Appellant contends that the aggravating circumstance found in this case was improperly submitted and found.

When the jury did not return a punishment verdict, the trial judge made a finding that the murder of Leland White involved torture and depravity of mind based upon the following instruction that had been given to the jury:

2. Whether the murder of Leland White involved torture and depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You

can make a determination of depravity of mind only if you find:

That the defendant committed repeated and excessive acts of physical abuse upon Leland White and the killing was therefore unreasonably brutal.

Appellant contends that the evidence was insufficient to support a finding that the murder involved torture and depravity of mind and as a result was outrageously and wantonly vile, horrible, and inhuman. Appellant also alleges that the "depravity of mind" aggravating circumstance, which the trial court found beyond a reasonable doubt in support of imposition of the death penalty, is unconstitutionally vague.

■ Appellant is mistaken in his claim that the evidence did not support a finding by a reasonable fact-finder that Leland White's murder involved torture and depravity of mind and as a result thereof was outrageously and wantonly vile, horrible, and inhuman beyond a reasonable doubt. The evidence shows that appellant inflicted numerous and excessive acts of physical abuse upon Leland White and that the killing was unreasonably brutal. White sustained numerous wounds, including superficial cuts across the neck and two severe incisions across the throat, one of which cut through the trachea. White also suffered superficial cuts to his right thigh and shoulder, a fractured rib, second and third degree burns and a minimum of four blunt trauma wounds to his head.

Although appellant contends that White would immediately have been rendered unconscious and died quickly as a result of the blunt trauma wounds to his head, a reasonable fact-finder could find from the evidence that White's throat was cut first and that he was still alive after the first barrage of blunt trauma wounds inflicted by appellant. The pathologist testified that the wounds to the neck bled considerably, indicating that White still had a strong heartbeat when the wounds occurred. The blows to the head resulted in sub-dural and sub-arachnoid hemorrhage, indicating that the heart was still beating when they occurred. The pathologist, therefore, could not say that the head wounds occurred before the neck wounds because both bled and resulted in considerable hemorrhage. Based upon the evidence adduced from Lucius House, the pathologist speculated that the wounds to the throat occurred before the wounds to the head. The possible lengths of time that it might have taken White to die from the trauma to the head could vary, but with open brain tissue exposed to the air, White would have been rendered unconscious quickly and probably died shortly after infliction of those injuries. In sum, a fact-finder could reasonably find from the evidence that appellant cut White's throat first and that the likely cause of death was the blunt trauma wounds to the head.

■ As for appellant's claim that the aggravating circumstance found by the fact-finder is unconstitutionally vague, this Court has judicially defined and limited the phrase upon which appellant focuses, "depravity of mind," to the following: defendant acted with a callous disregard for the sanctity of life; defendant inflicted physical or psychological torture upon his victim, as when the victim has a substantial period of time before death to anticipate and reflect upon death; the brutality of defendant's conduct or nature of the crime involved serious physical abuse; mutilation of the body after death; absence of any substantive motive; or the absence of remorse. *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. banc 1993) *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994); *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). At least one of the factors set forth in *Ramsey* and *Preston* "must be present before a finding of depravity of mind will be found to be supported by the evidence." *State v. Griffin*, 756 S.W.2d 475, 490 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989).

MAI–CR3d 313.40 reflects the holding in *Griffin*. Under the approved instructions, when "depravity of mind" and "torture" are submitted, the court must continue the instruction by including, as a finding supported by the evidence, one of the limiting definitions contained in paragraph (B) [1] to [10]. MAI–CR3d 313.40, Notes on Use 7(C). The applicable Notes on Use required the nar-

rowing definition in this case, as supported by the evidence, that appellant "committed repeated and excessive acts of physical abuse upon Leland White and the killing was therefore unreasonably brutal." *See* MAI–CR3d 313.40 Notes on Use 7(B)[2]. The depravity of mind language and limiting instruction provide sufficient guidance to the sentencing jurors such that the instruction is not unconstitutionally vague. *State v. Tokar*, 918 S.W.2d 753, 772 (Mo. banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). In addition, the aggravating circumstance at issue tracks the language of MAI–CR3d 313.40.7. *State v. Feltrop*, 803 S.W.2d 1, 14 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). MAI–CR3d instructions are presumptively valid and should be given "to the exclusion of any other instruction." *State v. Ervin*, 835 S.W.2d 905, 922–23 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746. The aggravating circumstance of depravity of mind is not unconstitutionally vague.

### C.

Pursuant to section 565.035.3(3), this Court must determine whether appellant's sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering . . . the crime, the strength of the evidence and the defendant." *Feltrop*, 803 S.W.2d at 16.

■ The sentence in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. This case is similar to others in which penalties were imposed upon a finding of depravity of mind. *See, e.g., State v. Taylor*, 929 S.W.2d 209, 222 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1088, 137 L.Ed.2d 222 (1997); *State v. McMillin*, 783 S.W.2d 82, 105 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990); *State v. Schneider*, 736 S.W.2d 392, 404 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988); *State v. Rodden*, 728 S.W.2d 212, 222 (Mo. banc 1987), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991); *State v. Jones*, 705 S.W.2d 19, 24 (Mo. banc), *cert.*

*denied*, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986). The evidence of appellant's guilt is strong. Appellant made no showing that the diagnosis of his having a seizure disorder and a cognitive disorder NOS prevented him from understanding right from wrong and from conforming his conduct in accordance with the law. He scored on the average to above average IQ range. His conduct reflects a disregard for human life.

■ Appellant's contention that this Court's proportionality review violates due process is without merit. Proportionality review is not constitutionally mandated, *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), and this Court has repeatedly reviewed and rejected identical claims. *State v. Richardson*, 923 S.W.2d 301, 329 (Mo. banc 1996); *State v. Weaver*, 912 S.W.2d 499, 522 (Mo. banc 1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996); *State v. Whitfield*, 837 S.W.2d 503, 514–15 (Mo. Banc 1992), *cert. denied*, —— U.S. ——, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997). Proportionality review is designed as an additional safeguard against arbitrary and capricious sentencing and is intended to promote the evenhanded, rational and consistent imposition of death sentences. *State v. Ramsey*, 864 S.W.2d at 328. Appellant's claim of unconstitutionality is denied. The trial court's imposition of the sentence of death for the murder of Leland White was not disproportionate under all the facts and circumstances presented at trial.

### XI.

The judgment is affirmed.

BENTON, C.J., PRICE, LIMBAUGH and HOLSTEIN, JJ., concur.

WOLFF, J., concurs in part and dissents in part in separate Opinion filed.

WHITE, J., concurs in Opinion of WOLFF, J.

WOLFF, Judge, concurring in part and dissenting in part.

In the circumstances of this trial, where the jury deadlocked on whether or not to

impose the death penalty, I find the evidence insufficient to support the trial judge's decision to impose the death penalty. This is a case where one has to strain to find evidence sufficient to sustain a verdict that this was a premeditated killing done after cool reflection. Yet the trial court found enough evidence to submit the case, and the jury found the defendant guilty of first-degree murder. Upon review of the evidence, I just barely concur that there was a submissible case of first-degree murder. Furthermore, in order to impose the death penalty, the jury was required to find that this killing involved torture and depravity of mind or that the killing was done for money. One or more of the jurors were unable to agree that death is the appropriate penalty. I agree with those jurors on that point, find no evidence to support the death penalty, and so, dissent from the majority's decision to affirm the death penalty imposed by the trial court.

Rufus James Ervin and the victim, Leland White, had known each other for fifteen years or so at the time of White's killing. Ervin and White discussed buying land together sometime early during their friendship. When Ervin returned from Army training camp in the early 1980's, White had bought the land in Reynolds County on which this altercation and killing occurred. Ervin moved to the land first, and, in 1985 or 1986, White moved there permanently.

Initially, the two men lived together in a sixteen-foot by eighteen-foot trailer on the property. Later they purchased a second trailer. White moved into the new trailer while Ervin kept the first trailer. They linked the two trailers together. Ervin lived there part-time and in the St. Louis area part-time with his mother.

In August 1994, Ervin had a mechanical business, was a temporary laborer, and did some carpentry. On August 31, 1994, Ervin worked during the day at a manufacturing plant in Jefferson County and was called back for a night shift. After working briefly on the night shift, Ervin and three other men went to the Reynolds County property, arriving between 1:30 and 2:30 a.m. The men had been drinking. Prior to the trip, White had contacted Ervin about buying another piece of land and had asked Ervin to meet with him as soon as possible. When Ervin and the other men arrived at the property, White came out to greet them. White and Ervin shook hands and went into the trailer while the other men waited in the car drinking.

After about fifteen minutes, a fight or confrontation of some kind broke out inside the trailer. Ervin was heard to scream, "This is mine. This is mine." A lamp apparently tipped over during this fight setting fire to the trailer. A witness heard White say, "Don't let me burn. Don't let me burn." Ervin dragged White out of the burning trailer and propped him against a tree.

At this point, Ervin, who was thirty-four years old at the time, had overpowered and perhaps beaten and cut White, who was then sixty-six years old. Yet, Ervin at this point had saved White from the burning trailer.

When Ervin put White against the tree, White then said, "Go ahead and kill me, James," and Ervin took a brick and hit him in the head several times, killing him.

To convict Ervin of first-degree murder, the state must prove beyond a reasonable doubt that he knowingly caused the death of another person "after deliberation upon the matter." Section 565.021.1, RSMo 1994. "Deliberation" is statutorily defined as "cool reflection for any length of time no matter how brief; ..." Section 565.002.3, RSMo 1994. The time may be brief, but it cannot be nonexistent. Ordinarily, deliberation must be proved through evidence of circumstances surrounding the killing. *State v. Rousan*, 961 S.W.2d 831, 841 (Mo. banc 1998). *See also, State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997); and *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991). Ervin's action of saving White from the burning trailer and then killing him is paradoxical when one tries to infer deliberation up to that point. Ervin's act of hitting White again after the initial sequence of blows out by the tree appears to bring the case in line with those cases in which this Court has sustained convictions where a beating took place over a period of time. *See, e.g., State v. Johnston*, 957 S.W.2d 734, 748–749 (Mo. banc 1997); *State v. Roberts*, 709 S.W.2d 857, 863 (Mo.

banc 1986), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986); and *State v. LaRette,* 648 S.W.2d 96, 103 (Mo. banc 1983), *cert. denied,* 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983). Though there does not seem to be much of a time sequence here, there is enough, barely, to support the jury's verdict.

In the penalty phase, the jury deadlocked on the question of whether or not the death sentence should be imposed. The jury deadlock on punishment has the effect of referring the matter to the trial judge for his or her determination. *State v. Griffin,* 756 S.W.2d 475, 486–488 (Mo. banc 1988). While the two phases of a capital murder trial are viewed separately, they are presented to the same jurors who have heard the evidence as to the circumstances of the killing. This was a death-qualified jury, that is, all members were screened to ascertain that they could, if the evidence so warranted, recommend imposition of the death penalty. But this death-qualified jury could not.

It is plausible, without speculating too broadly, that individual jurors, having acquiesced to the collective conscience of the group as to the sufficiency of the evidence of premeditated murder, were unable to bring themselves to recommend imposition of the death penalty on these facts.[1]

The trial judge's findings were that Ervin's act involved torture and depravity of mind and warranted the death penalty.[2] When the trial judge assessed the death penalty, presumably he used the same standards as were submitted to the jury, that is, that the murder of Leland White "involved torture and depravity of mind and, ... as a result thereof, the murder was outrageously and wantonly vile, horrible and inhuman." Further, as the jury was told, a determination of depravity of mind can only be made if "the defendant committed repeated and excessive acts of physical abuse upon Leland White and the killing was therefore unreasonably brutal."

In *State v. Preston,* 673 S.W.2d 1, 11 (Mo. banc 1984), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), this Court noted the following factors to be considered in finding depravity of mind: "mental state of defendant, infliction of physical or psychological torture upon the victim as when the victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime."

An intentional killing of another human being often can be equated with having a depraved mind. But the law demands more, as *Preston* indicates. In the specific instance here, the trial court found torture. By ordinary definition, torture involves infliction of pain for its own sake. But the evidence does not support such a finding in this situation.

The pathologist, Dr. Zaricor, stated that the head injuries suffered by the victim would have rendered White immediately unconscious and he would have died fairly quickly. Similarly, the neck injuries would have disabled White. Moreover, the doctor was unable to specify which injuries were inflicted first, although through history based upon witness testimony, he believes the neck injuries could have been sustained first. If the head injuries occurred first, White did not suffer physical pain for any substantial period of time, since the head injuries would have rendered him unconscious very quickly after they were inflicted. Moreover, as one of the witnesses testified, it was White who asked that Ervin kill him after Ervin had dragged him out of the fire. There is no evidence that Ervin intended to cause White unnecessary or prolonged suffering, or that Ervin inflicted pain for its own sake, so as to support the finding of the trial court that there was torture and depravity of mind.

In another context, this Court held in *State v. Chaney,* 967 S.W.2d 47 (Mo. banc 1998)

1. Ervin said his law enforcement interrogators raised the specter of lynching since Ervin is African–American and his victim was a white man, in a rural, mostly white county. Though the allusion to race is raised, there is no evidence that race was a factor in the outcome of this trial

where a white jury was unable to agree upon the penalty.

2. The trial judge did not find that Ervin murdered White for money, which was the other aggravating circumstance submitted to the jury.

that, while the evidence may be sufficient to sustain a finding of first degree murder, a sentence of death would be vacated where the evidence was not sufficiently strong or compelling. In *Chaney,* of course, the defendant denied being the perpetrator. *Id.* In this case, there is no question that Ervin beat Leland White to death. But there is little evidence to sustain the finding of premeditation, and none to show torture and depravity of mind. As such, I would reduce the sentence of death to life imprisonment.